UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| IMAGEKEEPER LLC, ) | |
| ) | |
| Plaintiff, ) | Case No.: 2:20-cv-01470-GMN-VCF |
| vs. ) | |
| ) | **ORDER** |
| WRIGHT NATIONAL FLOOD INSURANCE ) | |
| SERVICES LLC, ) | |
| ) | |
| Defendant. ) | |

Pending before the Court is the Motion for the Emergency Motion for Ex Parte Temporary Restraining Order, Preliminary Injunction, (ECF No. 2), filed by Plaintiff ImageKeeper LLC ("Plaintiff"). In support of its Motion, Plaintiff also filed the Declaration of Jerry Speasl, (ECF No. 6), the Declaration of H. Stan Johnson, (ECF No. 13),[1] and two Sealed Exhibits, (ECF Nos. 7, 8). For the reasons set forth below, Plaintiff's Motion for Temporary Restraining Order is **GRANTED**.

**I.    BACKGROUND**

This action arises from Defendant Wright National Flood Services, LLC's purported misappropriation and use of Plaintiff's trade secrets and confidential information. (*See* Verified Compl, ECF No. 1). Plaintiff alleges the following:

Plaintiff ImageKeeper provides software to quickly track, prepare, and process flood insurance claims through its mobile applications. (*See* Speasl Decl. ¶¶ 4, 6, 12, ECF No. 6). Plaintiff's Flood Claim Service System (the "ImageKeeper System") is a software solution for

---

[1] On August 7, 2020, the Court entered a Minute Order, (ECF No. 12), directing Plaintiff to "either serve Defendant [Wright National Flood Insurance Services LLC] with a copy of the Motion and Complaint, or file a supplement justifying Plaintiff's request for the Court to address its Motion for Temporary Restraining Order on an ex parte basis." In response, Plaintiff filed the Declaration of H. Stan Johnson, (ECF No. 13). In the declaration, Plaintiff's counsel sets forth the different manners in which Plaintiff has given Defendant notice of the instant proceedings. (Johnson Decl. ¶¶ 2–6, ECF No. 13).

documenting and processing flood claims. (*Id.* ¶ 4). The ImageKeeper System comprises a secure portal ("Secure Portal") to the ImageKeeper Cloud and a mobile adjuster application ("Adjuster Application"). (*Id.*). The Secure Portal is only accessible from the web with unique and secure login credentials, only made available through Plaintiff. (*Id.* ¶ 5). The Adjuster Application is downloadable to an iPhone or similar mobile device from the Secure Portal. (*Id.*). The Adjuster Application likewise requires secure credentials to open and use the application. (*Id.*).

Defendant Wright National Flood Insurance Services LLC ("Defendant") has been customer of the ImageKeeper System since 2016 and is Plaintiff's largest customer. (*Id.* ¶ 9). Defendant uses the ImageKeeper System to handle flood insurance claims backed by the Federal Emergency Management Agency (FEMA). (*Id.* ¶ 11). In October 2019, following disputes over unpaid invoices, Plaintiff sent its final demand for Defendant to pay its invoices and enter a new services agreement. (*Id.* ¶ 16). Defendant agreed and the parties entered into a Software and Services Agreement ("SSA"), effective October 31, 2019. (*Id.*); (SSA, Ex. 2 to Speasl Decl., ECF No. 8).

Pursuant to the terms of the SSA, "Confidential Information," as applied to Plaintiff, is defined to mean "the proprietary aspects of the Service." (SSA § 7.2). In turn, "Service" is defined to mean "a collective reference to the ImageKeeper Software and all related activities in connection with the provisioning and delivery of the services described in [the SSA]." (*Id.* § 5.1). As it applies to both parties, "Confidential Information" is defined as "any other information that the disclosing party labels in writing as 'confidential' or which, under the circumstances of the disclosure, should be reasonably considered confidential by Recipient." (*Id.* § 7.2).

The SSA also imposes confidentiality and non-disclosure obligations. For example, it forbids copying of Confidential Information or disclosure to third parties:

> 7.1 Non-Disclosure. The party receiving Confidential Information of the other (the "Recipient") *shall protect the confidentiality of the Confidential Information of the other party* (the "Discloser") . . . Recipient shall hold the Confidential Information of Discloser in trust and confidence and *shall not copy* Discloser's Confidential Information *or disclose such information to any third parties* . . . .

SSA § 7.1 (emphasis added). Pursuant to the SSA, Defendant also agreed that "all intellectual property rights (patents, trade secrets, copyrights, trademarks and similar rights)" pertaining to the Service "remain the sole property of [Plaintiff] ImageKeeper." (*Id.* §§ 5.1, 13.7).

Further, the SSA expressly restricts Defendant's access as a customer and the access of its end users. Section 6.1 allows Defendant access "solely for sole purposes of operating the Service in its intended manner as a flood claim processing, archival and retrieval system and for no other purpose." (*Id.* § 6.1). "End User[s]" are agents of Defendant or third parties that are granted access to the Service by Defendant. (*See id.* § 6.2). Under the SSA, each End User must "execute a 'click through' [End User License Agreement]/Terms & Conditions" before the End User is provided access to the Secure Portal or Adjuster Application. (*Id.*). In addition, each End User is issued a "unique user name and password by [Plaintiff] ImageKeeper." (*Id.* § 6.3). Under the SSA, Defendant further agreed "that *no user name or password will be utilized at any time by any person* other than the End User to whom such user name or password was originally assigned*.*" (*Id.*) (emphasis added).

Finally, the SSA expressly prohibits Defendant from reverse engineering, copying and/or distribution of the ImageKeeper System:

> 6.4 Restrictions. To the maximum extent allowed by applicable law, *Customer shall not reverse engineer*, reverse assemble, decompile or otherwise attempt to derive source code from the Software. *Customer shall not . . . (iii) distribute, copy, rent, lease, sublicense or otherwise transfer the Software to any third party*[.]

(*Id.* § 6.4).

In July 2020, Plaintiff discovered Defendant's mobile "Claims Application for Adjusters" on the Apple Store. (Speasl Decl. ¶ 35). Defendant's application looked and functioned like ImageKeeper's Adjuster Application. (*Id.* ¶¶ 35, 36). Plaintiff then discovered that, in late-December 2019, Defendant had shared unique administrator login credentials registered to its Chief Information Officer (CIO), Tim Love, with individuals in Hyderabad, India. (*Id.* ¶¶ 39, 40). Plaintiff further alleges that it developed an "audit trail" which revealed that these unknown individuals, without Plaintiff's authorization or approval, had repeatedly accessed, used, and tested Plaintiff's Secure Portal and Adjuster Application from India. (*Id.* ¶¶ 40–56).

Plaintiff filed suit on August 7, 2020, alleging violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and Nevada's codification of the Uniform Trade Secrets, NRS Chapter 600A, as well as other state and federal claims. (Verified Compl., ECF No. 1). Plaintiff also filed the instant Motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for an order temporarily restraining Defendant from: (1) using, misappropriating, and disclosing Plaintiff's confidential information and proprietary trade secrets; and (2) breaching the SSA by offering a competing software application copied from Plaintiff's confidential and proprietary technology. (Pl.'s Mot. TRO at 23, ECF No. 2).

## II. LEGAL STANDARD

The same legal standard applies to both temporary restraining orders and preliminary injunctions sought pursuant to Federal Rule of Civil Procedure 65. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the analysis applied to temporary restraining orders and preliminary injunctions is "substantially identical"). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court may grant such relief only upon a petitioner's showing of (1)

likelihood of success on the merits, (2) likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities weighs in petitioner's favor, and (4) an injunction is in the public interest. *Id.* at 20.  A temporary restraining order is distinguished by its "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974); *see also* Fed. R. Civ. P. 65(b) (limiting temporary restraining orders to 14 days unless extended for good cause, and providing for expedited hearings on preliminary injunctions).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.  The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citing 11 C. Wright and A. Miller, Federal Practice and Procedure, Civil, § 2949 at 471 (1973)).

### III. DISCUSSION

The Court, having considered the Verified Complaint, Plaintiff's Motion, supporting declarations, and accompanying exhibits, finds that Plaintiff has met each of the *Winter* factors. Thus, the issuance of a temporary restraining order is appropriate.

### A. Likelihood of Success on the Merits

In two of its claims, Plaintiff asserts that Defendant misappropriated Plaintiff's trade secrets in violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.*, and Nevada's codification of the Uniform Trade Secrets Act (NUTSA), NRS Chapter 600A.  In order to state a claim for misappropriation under the NUTSA, a plaintiff must allege: (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) that the misappropriation was made in breach

of an express or implied contract or by a party with a duty not to disclose. *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000). A claim for misappropriation under the DTSA has substantially similar elements. *See* 18 U.S.C. § 1836; *Switch Ltd. v. Fairfax*, No. 2:17-cv-02651-GMN-VCF, 2018 WL 4181626, at *3 (D. Nev. Aug. 30, 2018).

A trade secret is "information, including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." NRS 600A.030(5); 18 U.S.C. § 1839 (providing similar definition). In addition, both the DTSA and NUTSA define "misappropriation" as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" in specified circumstances. 18 U.S.C. § 1839(5)(A); NRS 600A.030.

Here, Plaintiff has shown that it will likely meet each of these elements. Plaintiff's programmatic creation and management of adjuster accounts; programmatic claim assignment to adjusters; automated disposition of preliminary reports; embedded toolset with automated reports, quick start guides, and photo editing tools, *inter alia*, which are used in the Secure Portal and Adjuster Application, derive economic value through not being readily available to the public, (Speasl Decl. ¶¶ 21–23, ECF No. 6), and Plaintiff has made reasonable efforts to maintain said information private. Indeed, Plaintiff has demonstrated that it limits access only to customers who have signed a service agreement. (*Id.* ¶ 26). Further, Plaintiff limits the number of End Users who have login credentials and requires each authorized End User to have

unique login credentials. (*Id.* ¶ 27).  In addition, anyone who attempts to log into the Secure Portal or Adjuster Application must first agree to ImageKeeper's terms and conditions that prohibit attempts to "copy," "reverse engineer," "create derivative works," or "misappropriate" ImageKeeper's intellectual property." (*Id.* ¶ 29).

Furthermore, Plaintiff has shown that Defendant likely misappropriated the trade secrets by acquiring them through improper means and by using the trade secrets to develop a clone mobile application. (*See* Speasl Decl. ¶¶ 39–56).  Defendant knew that Plaintiff's information and technology was confidential under the terms of the SSA requiring non-disclosure and restricted access and use. (*See* SSA §§ 6.1–6.4, 7.1, 7.2, Ex. 2 to Speasl Decl., ECF No. 8). Under the SSA, copying the ImageKeeper System and disclosing it to unauthorized third-parties is expressly forbidden. (*Id.*).  Defendant also had reason to know that Plaintiff's information was confidential by the number of security measures protecting the ImageKeeper System. (Speasl Decl. ¶ 31).

As detailed in the declaration of ImageKeeper's CEO, Jerry Speasl, the recorded audit trail of Defendant's misappropriation shows: (1) Defendant shared login credentials registered to its CIO with unauthorized software developers in India, (*id.* ¶ 40); (2) Defendant's software developers accessed Plaintiff's confidential information in India, (*id.*); (3) Defendant's software developers engaged in systematic and comprehensive testing and use of the ImageKeeper System from December 2019 to May 2020, when Defendant released its clone application, (*id.* ¶¶ 40–43); (4) Defendant's clone application has the same features and functionality as Plaintiff's Adjuster Application, (*id.* ¶ 35); and (5) Defendant's largest adjuster firm, Colonial Claims, likely switched from using Plaintiff's Adjuster Application to using Defendant's clone application at least as of July 9, 2020, (*id*. ¶ 55).

Accordingly, Plaintiff has shown that it is likely to succeed on its DTSA and NUTSA causes of action against Defendant.

### B. Likelihood of Irreparable Harm

To carry its burden, Plaintiff must also establish that it will likely suffer irreparable harm without the issuance of injunctive relief. *Winter*, 555 U.S. at 21. Plaintiff must "demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Id*.

Here, Plaintiff has shown that allowing Defendant to continue to use Plaintiff's trade secrets and confidential information would likely result in immediate and irreparable injury to Plaintiff in the form of loss of income, loss of goodwill, damage to its reputation, and damage to its business relationships. (Speasl Decl. ¶¶ 58–61); *see Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) (holding that the harm occasioned by disclosure of trade secrets or confidential information is sufficient to meet the irreparable harm requirement); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853 (N.D. Cal. 2019); *Planned Parenthood of Great Nw. & Hawaiian Islands, Inc. v. Azar*, 352 F. Supp. 3d 1057, 1065 (W.D. Wash. 2018). The likelihood of irreparable harm element is therefore satisfied.

### C. Balance of Equities

In cases where a plaintiff has shown a defendant is likely misappropriating a trade secret, courts have routinely held that the degree of hardships favors the plaintiff. *See, e.g.*, *WeRide Corp.*, 379 F. Supp. 3d at 854. If Defendant does not currently possess Plaintiff's trade secrets or is not using them, then imposition of this temporary restraining order will not harm Defendant. Conversely, even if Defendant is using Plaintiff's trade secrets, imposing this temporary restraining order will not harm any of Defendant's legitimate business and will only protect Plaintiff's rights. As such, this factor favors Plaintiff.

### D. Public Interest

"The public interest analysis for the issuance of [injunctive relief] requires [district courts] to consider whether there exists some critical public interest that would be injured by

the grant of preliminary relief." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (citation omitted).  In this case, the Court finds no such public interest that would be injured by the issuance of such injunctive relief.

Moreover, the public interest favors imposing a temporary restraining order.  As this District has held, "there is a strong public interest in protecting trade secrets, as evidenced by the existence of the DTSA and [NUTSA]." *Protection Techs., Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912, at *3 (D. Nev. Mar. 8, 2017).  Accordingly, the Court finds that Plaintiff has satisfied the requirements of imposing a temporary restraining order on Defendant and grants the Motion.

### E.   Bond

The issuance of a temporary restraining order is conditioned on the movant posting security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The district court is afforded wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).  Further, a strong likelihood of success on the merits may favor "a minimal bond or no bond at all." *California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985).

Given the likelihood that Plaintiff will succeed on the merits and the limited hardship that a temporary restraining order will impose, there is a low probability that Defendant will suffer damages caused by an improperly granted temporary restraining order.  The Court therefore declines to order a bond in this case.

///

///

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order, (ECF No. 2), is **GRANTED**.  Defendant is **TEMPORARILY RESTRAINED** from:

(1) misappropriating, using, and disclosing Plaintiff ImageKeeper LLC's confidential information and proprietary trade secrets; and

(2) breaching the Software and Services Agreement entered into by and between Defendant and Plaintiff ImageKeeper LLC (including various other terms and obligations merged therein) by offering a competing software application copied from Plaintiff ImageKeeper LLC's confidential and proprietary technology.

**IT IS FURTHER ORDERED** that Plaintiff shall serve Defendant with a copy of this Order by Thursday, August 13, 2020.

**IT IS FURTHER ORDERED** that Defendant shall have until Wednesday, August 19, 2020, to file its response brief to Plaintiff's Motion for Preliminary Injunction, (ECF No. 2). Thereafter, Plaintiff shall have until Monday, August 24, 2020, to file its reply brief.

**IT IS FURTHER ORDERED** that this matter is set for hearing on Plaintiff's Motion for Preliminary Injunction on Wednesday, August 26, 2020, at 2:00 P.M. in Las Vegas Courtroom 7D.

**DATED** this __11__ day of August, 2020.

_____
Gloria M. Navarro, District Judge
United States District Court