DOMINICA C. ANDERSON (SBN: 2988)
DANIEL B. HEIDTKE (SBN 12975)
**DUANE MORRIS LLP**
100 N. City Parkway, Suite 1560
Las Vegas, NV 89106-4617
Tele: 702.868.2600; Fax:  702.385.6862
E-Mail: dcanderson@duanemorris.com
              dbheidtke@duanemorris.com

TERRY W. AHEARN (admitted *pro hac vice*)
D. STUART BARTOW (admitted *pro hac vice*)
**DUANE MORRIS LLP**
2475 Hanover Street
Palo Alto, CA 94304-1194
Tele: 650-847-4150; Fax: 650.403.1902
E-Mail: twahearn@duanemorris.com
              dsbartow@duanemorris.com

JORDANA A. GARELLEK (admitted *pro hac vice*)
**DUANE MORRIS LLP**
1540 Broadway
New York, NY 10036-4086
E-mail:   JGarellek@duanemorris.com

NELSON STEWART
(admitted *pro hac vice*)
**DUANE MORRIS LLP**
230 Park Avenue, Suite 1130
New York, NY 10169-0079
E-mail:   NMStewart@duanemorris.com

BRIANNA M. VINCI
(admitted *pro hac vice*)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
E-mail:   BVinci@duanemorris.com

Attorneys for Defendant
*Wright National Flood Insurance
Services, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

|  |  |
|---|---|
| IMAGEKEEPER LLC, a Nevada Limited Liability Company,<br><br>                    Plaintiff,<br><br>          v.<br><br>WRIGHT NATIONAL FLOOD INSURANCE SERVICES, LLC, a Delaware Limited Liability Company, and EVOKE TECHNOLOGIES PRIVATE LIMITED, an Ohio Foreign Corporation,<br><br>                    Defendant. | Civil Action No.: 2:20-cv-01470-CDS-VCF<br><br>**DEFENDANT WRIGHT NATIONAL FLOOD INSURANCE SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>**DOCUMENT SOUGHT TO BE FILED UNDER SEAL**<br><br>**REDACTED** |

Defendant Wright National Flood Insurance Services, LLC ("Wright Flood"), pursuant to Rule 56 of the Federal Rules of Civil Procedure hereby moves for summary judgment against Plaintiff ImageKeeper LLC's ("Plaintiff"). This Motion is made and based upon the papers and pleadings on file, the memorandum of points and authorities, and declaration that follows, and any oral argument this Court may entertain.

Dated: March 24, 2023           DUANE MORRIS LLP

By:    /s/ *Terry W. Ahearn*
        Dominica C. Anderson
        Terry W. Ahearn
        D. Stuart Bartow
        Daniel B. Heidtke
        Jordana A. Garellek
        Nelson Stewart
        Brianna M. Vinci
**Attorneys for Defendant** *Wright National Flood Insurance Services LLC*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................1

II.    LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT ...........................2

III.   LOCAL RULE 56-1 STATEMENT OF UNDISPUTED MATERIAL FACTS ...............3

    A.    THE ALLEGED TRADE SECRETS ARE EXTINGUISHED AND ABANDONED ........................................................................... 3

         1.    The Alleged Trade Secrets Were Publicly Disclosed and Extinguished As Of January 9, 2020 In A Published U.S. Patent Application And Related Provisional Application ................................................... 3

         2.    The Alleged Trade Secrets Were Abandoned In Early 2020 And Were Obsolete As Of August 12, 2020 ................................................... 5

    B.    COUNTS 3 AND 7 THROUGH 11 ARE PREEMPTED BY THE NEVADA UNIFORM TRADE SECRETS ACT................................................... 6

IV.   ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT .........................................9

    A.    THE ALLEGED TRADE SECRETS ARE EXTINGUISHED AND ABANDONED ........................................................................... 9

         1.    The Alleged Trade Secrets Were Publicly Disclosed And Extinguished As Of January 9, 2020 In A Published U.S. Patent Application And Related Provisional Application ................................................... 9

             a.    A Trade Secret Must Be Kept Secret ...............................................9

             b.    Public Disclosure Of An Alleged Trade Secret In A U.S. Patent Application Extinguishes Trade Secret Protection .......................10

             c.    The Alleged Trade Secrets Were Extinguished By Their Public Disclosure In U.S. Patent Applications Published Or Otherwise Made Publicly Available On January 9, 2020 ..............................10

                 i.    Alleged Trade Secret No. 1 Disclosed in '816 Publication and '528 Provisional ......................................11

                 ii.   Alleged Trade Secret No. 2 Disclosed in '816 Publication and '528 Provisional ......................................13

                 iii.  Alleged Trade Secret No. 3 Disclosed in '816 Publication and '528 Provisional ......................................14

                 iv.   Alleged Trade Secret No. 4 Disclosed in '816 Publication and '528 Provisional ......................................16

                 v.    Alleged Trade Secret No. 5 Disclosed in '816 Publication and '528 Provisional ......................................17

vi.     Alleged Trade Secret No. 6 Disclosed in '816 Publication and '528 Provisional ........................................20

vii.    Alleged Trade Secret No. 7 Disclosed in '816 Publication and '528 Provisional ........................................21

2.     The Alleged Trade Secrets Were Abandoned In Early 2020 And Were Obsolete As Of August 12, 2020 ............................................ 22

B.    COUNTS 3 AND 7 THROUGH 11 ARE PREEMPTED BY THE NEVADA UNIFORM TRADE SECRETS ACT .................................................. 25

1.     The Nev. UTSA Preempts Counts 3 And 7 Through 11 ......................... 25

2.     Plaintiff's Infringement of Trade Secrets Claim (NRS 603.080, 603.050) is Preempted by the Nev. UTSA ................................ 27

3.     Plaintiff's Unlawful Acts Regarding Computers Claim (NRS 205.4765, 205.477, 205.511) is Preempted by the Nev. UTSA .............. 27

4.     Plaintiff's Deceptive Trade Practices (NRS 41.600) Claim is Preempted by the Nev. UTSA ................................................... 28

5.     Plaintiff's Unfair Trade Practices Claim (NRS 603.080, 603.040) is Preempted by the Nev. UTSA ................................................... 28

6.     Plaintiff's Claim of Breach of the Implied Covenant of Good Faith and Fair Dealing is Preempted by the Nev. UTSA ......................... 29

7.     Plaintiff's Unfair Competition/Breach of the Duty of Loyalty Claim is Preempted by the Nev. UTSA ................................................... 29

V.     CONCLUSION ............................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Acclaim Lighting, Inc. v. Bruck*,
  No. 2:17-cv-00147-RFB-GWF, 2018 WL 11409433 (D. Nev. Sept. 24, 2018) ..........................30

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................................3

*Applied Indus. Materials Corp. v. Brantjes*,
  891 F.Supp. 432 (N.D.Ill.1994) ............................................................................................24

*Attia v. Google LLC*,
  983 F.3d 420 (9th Cir. 2020) ...............................................................................................10

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S. Ct. 2548 (1986)....................................................................................2

*Dai v. Freeman & Williams*,
  No. 3:05-CV-00269-ECR (VPC), 2007 U.S. Dist. LEXIS 111628
  (D. Nev. June 18, 2007)........................................................................................................3

*Dow Corning Corp. v. Jie Xiao*,
  283 F.R.D. 353 (E.D. Mich. 2012) .......................................................................................23

*Forcier v. Microsoft Corp.*,
  123 F. Supp. 2d 520 (N.D. Cal. 2000) ..................................................................................10

*Fox Sports Net N., L.L.C. v. Minnesota Twins P'ship*,
  319 F.3d 329 (8th Cir. 2003) ...............................................................................................22

*Frantz v. Johnson*,
  999 P.2d 351 (Nev. 2000)...........................................................................................*Passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
  475 U.S. 574 (1986)............................................................................................................3

*Menalco v. Buchan*,
  No. 2:07–CV–01178–PMP–PAL,
  2010 WL 428911 (D. Nev. Feb. 1, 2010) ..................................................................26, 28-30

*MicroStrategy, Inc. v. Business Objects, S.A.*,
  661 F.Supp.2d 548 (E.D.Va.2009) .......................................................................................24

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
  210 F.3d 1099 (9th Cir. 2000) ..............................................................................................2

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
  18 F.3d 1468 (9th Cir. 1994) ................................................................................................2

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ................................................................................10, 22

*Stutz Motor Car of Am. v. Reebok Int'l, Ltd.*,
  909 F. Supp. 1353 (C.D. Cal. 1995), *aff'd,* 113 F.3d 1258 (Fed. Cir. 1997) ................................10

*SVI, Inc. v. Supreme Corp.*,
  No. 2:16–cv–01098–JAD–NJK, 2016 WL 7190548 (D. Nev. Dec. 12, 2016) ............................26

*Switch Ltd. v. Fairfax*,
  2:17-cv-02651-GMN-VCF, 2018 U.S. Dist. LEXIS 148818
  (D. Nev. Aug. 30, 2018) ................................................................................10

*Symbion Rsch. Int'l v. Lewis*,
  No. 2:05-cv-01324-RLH-GWF, 2007 U.S. Dist. LEXIS 117989
  (D. Nev. Dec. 20, 2007) ................................................................................3

*Taylor v. Babbitt*,
  760 F. 2d 80 (D.D.C. 2011) ................................................................................22

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009) ................................................................................10

*W.L. Gore & Assocs., Inc. v GI Dynamics, Inc.*,
  872 F. Supp. 2d 883 (D. Ariz. 2012) ................................................................................10

**Statutes**

37 C.F.R. §1.211(a) ................................................................................4

37 C.F.R. §1.213(a) ................................................................................4

18 U.S.C. § 1839(3) ................................................................................9

35 U.S.C. §122(b)(1)(A) ................................................................................4

35 U.S.C. §122(b)(2)(B)(i) ................................................................................4

Fed. R. Civ. P. 56(c) ................................................................................2

Fed. R. Civ. Proc. 8 ................................................................................25

NRS 41.600 ................................................................................28

NRS § 600A.030(5) ................................................................................9

NRS 600A.090 ................................................................................*Passim*

NRS 603.040 ................................................................................28

NRS 603.050 ...................................................................................................................27, 28

NRS 603.080 ........................................................................................................................27

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This case concerns a former business relationship between Plaintiff and Wright Flood, which resulted in the joint development of a mobile application system for insurance companies, adjusting firms, and insurance claims adjusters to use when processing preliminary flood claims. Plaintiff called this the ImageKeeper System.[1]  Following the demise of the business relationship over exorbitant fees charged by Plaintiff and Plaintiff's threats to cut-off access to the jointly-developed ImageKeeper System, Wright Flood resolved to commission a new mobile application system to process flood claims, including the preliminary process that was performed by the ImageKeeper System.  Wright Flood called this system the Wright Flood Application.[2]  Wright Flood hired a third-party software vendor, Defendant Evoke Technologies Private Limited ("Evoke"), to build the new Wright Flood Application.  Plaintiff contends that the Wright Flood Application was created using Plaintiff's alleged trade secrets purportedly contained within the ImageKeeper System.  Wright Flood denies all claims being asserted by Plaintiff.

Notwithstanding Plaintiff had no prior knowledge of the flood claims-adjusting process and relied exclusively on Wright Flood for that information, Plaintiff surreptitiously filed multiple patent applications in 2018 and 2019 describing features conceived and specified by Wright Flood and the Federal Emergency Management Agency ("FEMA") or that were generic, well-known steps performed in any secure system.  The features described in these applications included the alleged trade secrets disclosed by Plaintiff in this case.  These patent applications were published by the U.S. Patent and Trademark Office ("USPTO") on January 9, 2020.  By law, the alleged trade secrets asserted in this case have been in the public domain for the world to see since this date.

Additionally, the undisputed facts of this case show that Plaintiff has abandoned the alleged trade secrets.  Plaintiff has admitted the alleged trade secrets were no longer used in the new ImageKeeper System developed and deployed by Plaintiff in early 2020.  Plaintiff further admitted

---

[1] Declaration of Robert Zeidman In Support of Defendant Wright Flood's Motion for Summary Judgment ("Zeidman Dec."), ¶15.

[2] Zeidman Dec., ¶16.

that they did not market, sell, service, or support the old ImageKeeper System after the new ImageKeeper System was deployed.  Any purported use of the alleged trade secrets by Wright Flood was halted no later than August 12, 2020.  These undisputed facts show that the alleged trade secrets were obsolete no later than August 12, 2020.

 Furthermore, Counts 3 and 7 through 11 of Plaintiff's First Amended Complaint ("Am. Comp.") are preempted.  The Nevada Uniform Trade Secrets Act ("Nev. UTSA") preempts claims that are based on the same nucleus of factual allegations underlying the misappropriation claim. Here, Counts 3 and 7 through 11 are based on the same set of facts as Plaintiff's Nev. UTSA claim. As a result, these counts are preempted and must be dismissed.

Plaintiff publicly disclosed the alleged trade secrets, then abandoned the alleged trade secrets, and its remaining counts are based on the same facts as its misappropriation allegations. For these reasons, Wright Flood requests that the Court enter summary judgment in favor of Wright Flood.

## II.    LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment prevents unnecessary trials where no material issue of fact exists.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).  A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322.  The moving party has the burden of demonstrating that no genuine issue as to any material fact exists.  *Celotex*, 477 U.S. at 323.  "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325; *see also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000) (a movant may meet its initial burden on summary judgment by showing that an opposing party lacks sufficient evidence to fulfill its ultimate burden of persuasion at trial).

Once a moving party has met its burden, the opposing party cannot "rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial." *Dai v. Freeman & Williams*, No. 3:05-CV-00269-ECR (VPC), 2007 U.S. Dist. LEXIS 111628, at *3 (D. Nev. June 18, 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court considers the following: (a) whether a fact is material; (b) whether a genuine issue for the trier of fact exists, as determined by the documents submitted to the court; and (c) the evidence in light of the appropriate standard of proof. *Id.* at *3-4 (citing *Anderson*, 477 U.S. at 248). The opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Symbion Rsch. Int'l v. Lewis*, No. 2:05-cv-01324-RLH-GWF, 2007 U.S. Dist. LEXIS 117989, at *13-14 (D. Nev. Dec. 20, 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" while "[d]isputes over irrelevant or unnecessary facts should not be considered." *Dai*, 2007 U.S. Dist. LEXIS 111628, at *4. A court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

## III.   LOCAL RULE 56-1 STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   THE ALLEGED TRADE SECRETS ARE EXTINGUISHED AND ABANDONED

#### 1.   THE ALLEGED TRADE SECRETS WERE PUBLICLY DISCLOSED AND EXTINGUISHED AS OF JANUARY 9, 2020 IN A PUBLISHED U.S. PATENT APPLICATION AND RELATED PROVISIONAL APPLICATION

On July 6, 2018, ImageKeeper filed a U.S. Provisional Patent Application No. 62/694,528 ("'528 Provisional") disclosing the jointly-developed ImageKeeper System at issue in this matter. Declaration of Terry W. Ahearn In Support of Defendant Wright Flood's Motion for Summary Judgment ("Ahearn Dec."), Ex. A. This application includes, as illustrated below, the same or similar descriptions of the alleged trade secrets as disclosed by Plaintiff. Ahearn Dec., Ex. A; Zeidman Dec., ¶¶20-21 and Ex. F. The '528 Provisional includes substantial portions of various ImageKeeper System "Quick Start" guides, which illustrates the various features of the system, including features that Plaintiff alleges as trade secrets in this case. Ahearn Dec., Ex. A at Figs. 36-57; Zeidman Dec.,

¶31.  The '528 Provisional discloses the workflow, user screens and reports defined and specified for the ImageKeeper System.  *Id.*

On July 8, 2019, ImageKeeper filed a U.S. Utility Patent Application No. 16/505,305 ("'305 Application") claiming priority to the July 6, 2018 '528 Provisional.  Ahearn Dec., Ex. B.  This application is virtually identical to the '528 Provisional and, likewise, discloses the ImageKeeper System, including, as illustrated below, the same or similar descriptions of the alleged trade secrets disclosed by Plaintiff in this case.  Ahearn Dec., Ex. B; Zeidman Dec., ¶¶20-21, 23.  The '305 Application contains figures and diagrams that Plaintiff uses in its First Amended Complaint filed in this matter.  Ahearn Dec., Ex. C ("Am. Comp."); *compare* Ahearn Dec., Ex. B ('305 Application) at Fig. 2 *with* Ahearn Dec., Ex. C ("Am. Comp.) at ¶14.

Under the United States Code, a patent application "shall be published…promptly after the expiration of a period of 18 months from the earliest filing date for which a benefit is sought."  35 U.S.C. §122(b)(1)(A); 37 C.F.R. §1.211(a).  A patent application shall not be published "[i]f an applicant makes a request **upon filing**" the application for non-publication.   35 U.S.C. §122(b)(2)(B)(i) (emphasis added); 37 C.F.R. §1.213(a).  Plaintiff filed the July 8, 2019 '305 Application **without** simultaneously submitting a request for non-publication as expressly required under the law.  Ahearn Dec., ¶3.

In accordance with the law, on January 9, 2020 (18 months after Plaintiff filed the July 6, 2018 '528 Provisional), the USPTO published the July 8, 2019 '305 Application (Pub. No. 2020/0014816 ("'816 Publication")) making it available in the public domain for anyone to view.  Ahearn Dec., Ex. D; Zeidman Dec., ¶¶21, 23 and Ex. E.  Likewise, given that Plaintiff's July 8, 2019 '305 Application claims the priority filing date (i.e. benefit) of the July 6, 2018 '528 Provisional, as of January 9, 2020, the July 6, 2018 '528 Provisional was also available on the USPTO's Public Patent Application Information Retrieval (PAIR) system for any member of the public to view.  Ahearn Dec., ¶6.  On December 28, 2021, the July 8, 2019 utility patent application issued and published as United States Patent No. 11,212,416 ('416 Patent).  *Id.* at Ex. E.

In accordance with an Order from the Court (ECF 157), on May 21, 2021, Plaintiff served its Second (and final) Supplemental Responses and Objections to Wright Flood's Interrogatory No. 1

1  ("Final Identification of Alleged Trade Secrets" or "Final ID").  Ahearn Dec., Ex. F (Final ID) at 10-

2  29); Zeidman Dec., Ex. B.  Plaintiff's Final ID discloses broad categories of information that lack

3  detailed descriptions of the seven alleged trade secrets as required under the Court May 21, 2021

4  Order and the law.[3]  *Id.*; Zeidman Dec., ¶22.

### 2.   THE ALLEGED TRADE SECRETS WERE ABANDONED IN EARLY 2020 AND WERE OBSOLETE AS OF AUGUST 12, 2020

████████████████████████████████████████████████

████████████ the alleged trade secrets disclosed in the Final ID.  Ahearn Dec., Exs. G (Plaintiff's Resp.

and Obj. to Wright Flood's Interrogatories 9 and 10) and F (Final ID at 10-29).  Mr. Patterson was

also Plaintiff's designated corporate witness on the scope and content of the alleged trade secrets.  *Id.*,

Ex. H (Feb. 22, 2022 Dep. M. Patterson) at 12:11-16:4 and Ex. 2 thereto.

        In the first part of 2020, Plaintiff developed and deployed their ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  *Id.*,

Ex. I at 166:23-167:4.

████████████████████████████████████  *Id.*, Ex. I at 165:21-166:18.

████████████████████████████████████████████████████

████████████████████████████████████  *Id.*, Ex. J (Feb. 23, 2022 Dep. M.

Patterson) at 123:9-124:24.

████████████████████████████  Ahearn Dec., Ex. K (Feb. 22,

2022 Dep. M. Patterson) at 240:22-242:4.

---

[3]  Wright Flood filed an early motion for summary judgment that Plaintiff's Final ID fails to adequately disclose the alleged trade secrets.  (ECF 218, 227, 236, 241).  This is a core element of Plaintiff's misappropriation claims on which Plaintiff bears the burden of proof.  Plaintiff failed to meet its burden to adequately disclose the alleged trade secrets.  *Id.*

*Id.*, Ex. K at 243:10-12.

The accused Wright Flood Application was completed for performance testing at the end of April 2020.  Ahearn Dec., Ex. L (Wright Flood's Supp. Resp. and Obj. to Plaintiff's Interrogatory 5 and Second Supp. Resp. and Obj. to Plaintiff's Interrogatory No. 6) at 16:13-16 and 21:18-21.  The Wright Flood Application went live at the end of May 2020.  *Id.*  Wright Flood stopped using the Wright Flood Application on August 12, 2020.  *Id.*  Wright Flood has no plans to revive the Wright Flood Application, or any mobile adjuster application, regardless of the outcome of this matter.  *Id.*  Wright Flood stopped using the old ImageKeeper System on August 12, 2020.

**B.    COUNTS 3 AND 7 THROUGH 11 ARE PREEMPTED BY THE NEVADA UNIFORM TRADE SECRETS ACT**

There is no dispute as to the nature of Plaintiff's claims of infringement of trade secrets (Count 3), unlawful acts regarding computers (Count 7), deceptive trade practices (Count 8), unfair trade practices (Count 9), implied covenant of good faith and fair dealing (Count 10), and unfair competition (Count 11).  Ahearn Dec., Ex. C.

Plaintiff's trade secret claims are based on its allegations that Wright Flood "obtained access to ImageKeeper's System and the underlying Trade Secrets through improper means."  Ahearn Dec., Ex. C (Am. Comp.) at ¶78.  In further support of its trade secret claims, Plaintiff asserts that "Wright Flood negotiated the SSA and agreed to strict confidentiality and non-disclosure obligations under false pretenses while never having the intention of complying with its terms while simultaneously providing Evoke access to the ImageKeeper System."  *Id.*  Plaintiff also claims that "Wright Flood . . . deliberately bypassed all security and authorization requirements by providing to one or more individuals at Evoke, . . its unique administrator login credentials that ImageKeeper had registered to and only to Wright Flood's Chief Information Officer."  *Id.*  According to the Plaintiff, it "had never given Wright Flood permission to provide, transfer, or share its credentials to Evoke or any third-party. . . . Evoke (at Wright Flood's direction) repeatedly—and without authorization or approval—accessed, used, and tested the ImageKeeper Portal and Adjuster Application in conjunction with the ImageKeeper Cloud from India for the sole purpose of misappropriating, misusing, copying,

replicating, and reverse engineering the Trade Secrets, as well as marketing (as their own) ImageKeeper's technology on Evoke's website and in Evoke-hosted Webinars." *Id.*

Plaintiff's infringement of trade secrets claim is based on its claim that "Defendants' actions constitute an infringement of trade secrets." Ahearn Dec., Ex. C (Am. Comp.) at Count 3, ¶¶ 90-96. Plaintiff alleges that ████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.*, Ex. M (Plaintiff's Sec. Supp. Resp. to Wright Flood's Interrogatory No. 7) at 46:9-12. ████████████████████████ ████████████████████████████████████████ *Id.* at 45:2-7, 45:16-18 (██████████████████████████████████████ ████████████) and 46:2-7 ██████████████████████████████████.

Plaintiff's claim under Nevada's unlawful acts regarding computers statute is based on the allegation that Wright Flood "without authorization, used, transferred, took, made copies of, obtained or attempted to obtain access to . . . the ImageKeeper System." Ahearn Dec., Ex. C (Am. Comp.) at Count 7, ¶¶134-139. Plaintiff has never specified what non-trade secret "confidential information" it believes was "unlawfully accessed." *Id.*, Ex. M (Plaintiff's Sec. Supp. Resp. to Wright Flood's Interrogatory No. 7) at 50:16-19.

Plaintiff bases its deceptive trade practices claims on allegations that Wright Flood marketed the ImageKeeper system as its own. *Compare* Ahearn Dec., Ex. C (Am. Comp.) at Count 8, ¶143 *with* ¶78. Plaintiff's Nev. UTSA and deceptive trade practices claims are both based on the alleged "clone system" and use of purported "trade secret technology." *Id.*, Ex. C (Am. Comp.) at ¶¶78, 143; *id.*, Ex. M (Second Supplemental Response to Interrogatory No. 7) at 51:8-12.

Plaintiff's unfair trade practices claims are similarly based on the allegation that "Defendants, either directly or through others, gained access to data stored in a computer, the ImageKeeper System, with the intent to convert the data to their own use, which is an unfair trade practice." Ahearn Dec., Ex. C (Am. Comp.) Count 9, ¶154. Plaintiff claims that the "unfair trade practice" at issue is Wright Flood's alleged ██████████████████████████████████████████████████████████████ ████████████████████████ and asserts that it is entitled to unjust enrichment damages for Wright Flood's alleged ████████████████████████████████████████████████████████████████████████

1   ███████   *Id.*, Ex. M (Plaintiff's Sec. Supp. Resp. to Wright Flood's Interrogatory No. 7) at 52:22-

2   24 (emphasis added).

3          In support of its claims relating to the implied covenant of good faith and fair dealing, Plaintiff

4   alleges that "Wright Flood abused its relationship with ImageKeeper in order to gain access to

5   ImageKeeper's trade secret information, as well as confidential information that may not constitute a

6   trade secret." Ahearn Dec., Ex. C (Am. Comp.) at Count 10, ¶159. Plaintiff's discovery responses

7   further indicate that this claim is based on the same facts that underlie its Nev. UTSA claim. *Id.*, Ex.

8   M (Plaintiff's Sec. Supp. Resp. to Wright Flood's Interrogatory No. 7) at 53:14-15 (alleging that

9   Wright Flood sought ███████████████████████████████████

10  ████████████████████████████).

11         Plaintiff's unfair competition/breach of the duty of loyalty claim explicitly asserts that

12  "Wright Flood breached its duty of loyalty by illegally copying and disclosing ImageKeeper's Trade

13  Secrets and confidential information. . . ." Ahearn Dec., Ex. C (Am. Comp.) at Count 11, ¶164.

14  Plaintiff's discovery responses indicate that this claim and the Nev. UTSA claim are based on an

15  identical underlying factual scenario. *Id.*, Ex. M (Plaintiff's Sec. Supp. Resp. to Wright Flood's

16  Interrogatory No. 7) at 54:14-18 (alleging that Wright Flood ██████████████████████

17  ████████████████████████████████ and requesting unjust enrichment

18  damages based on ██████████████████████████████████████████████

19  ████████████████████) (emphasis added).

20         It is undisputed that each of the claims presented in Counts 3 and 7-11 arises out of the same

21  alleged wrongdoing as the Nev. UTSA claims. Namely, Plaintiff bases each of these claims on the

22  alleged fact that Wright Flood, without authorization, accessed the ImageKeeper System, which

23  Plaintiff alleges contained trade secret and other confidential information. Ahearn Dec., Ex. C (Am.

24  Comp) at ¶¶90-96, 159. Plaintiff further alleges that this access was performed for the purpose of

25  copying, converting, and disclosing the information within the ImageKeeper System to facilitate the

26  creation of Wright Flood's new claims processing application. *Id.* at ¶¶154, 164. Plaintiff alleges

27  that Wright Flood marketed that system, which incorporated Plaintiff's information, as its own. *Id.*

28  at ¶143. Plaintiff cannot dispute that these facts are identical to those that underlie its trade secret

misappropriation claims.  *Id.* at ¶78.

## IV.  ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT

### A.  THE ALLEGED TRADE SECRETS ARE EXTINGUISHED AND ABANDONED

#### 1.  THE ALLEGED TRADE SECRETS WERE PUBLICLY DISCLOSED AND EXTINGUISHED AS OF JANUARY 9, 2020 IN A PUBLISHED U.S. PATENT APPLICATION AND RELATED PROVISIONAL APPLICATION

Wright Flood seeks summary judgment that the alleged trade secrets were publicly disclosed and, therefore, extinguished as of January 9, 2020.  On this date, the alleged trade secrets were publicly disclosed in two U.S. patent applications making the alleged trade secrets available in the public domain for anyone to view.  As a result of this public disclosure, Plaintiff extinguished all rights to the alleged trade secrets, including any alleged misappropriation or damages, from this date forward.

##### a.  A Trade Secret Must Be Kept Secret

Under the Defend Trade Secrets Act (DTSA):

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) **the owner thereof has taken reasonable measures to keep such information secret**; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3) (emphasis added).

Similarly, the Nevada Uniform Trade Secrets Act defines a trade secret as "information, including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction or code," which "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by the public" and **"[i]s the subject of efforts . . . to maintain its secrecy."**  NRS § 600A.030(5) (emphasis added).

Thus, in order to maintain the protections provided under the DTSA and the Nev. UTSA, **a trade secret must remain secret**.  "[A]n unprotected disclosure of the holder's secret terminates the existence of the trade secret." *Stutz Motor Car of Am. v. Reebok Int'l, Ltd.,* 909 F. Supp. 1353, 1359 (C.D. Cal. 1995), *aff'd,* 113 F.3d 1258 (Fed. Cir. 1997).  Indeed, the U.S. Supreme Court has held that "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).  Courts in this District have, likewise, held "that information disclosed in the public domain cannot give rise to a claim based on trade secrets." *Switch Ltd. v. Fairfax*, 2:17-cv-02651-GMN-VCF, 2018 U.S. Dist. LEXIS 148818, *9 (D. Nev. Aug. 30, 2018).

### b. Public Disclosure Of An Alleged Trade Secret In A U.S. Patent Application Extinguishes Trade Secret Protection

One particular form of disclosure repeatedly held to extinguish trade secret protection is the inclusion of alleged trade secrets in a patent application.  *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 528 (N.D. Cal. 2000); *see also Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) ("disclosure of a trade secret in a patent places the information comprising the secret into the public domain.  Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and the patentee's only protection is that afforded under the patent law."); *Attia v. Google LLC*, 983 F.3d 420 (9th Cir. 2020) ("it appears to us to be well-settled that publication of information in a patent application eliminates any trade secrecy."); *W.L. Gore & Assocs., Inc. v GI Dynamics, Inc.*, 872 F. Supp. 2d 883, 899 (D. Ariz. 2012) ("[d]isclosure of a trade secret in a patent places the information comprising the secret into the public domain and eliminates trade secret protection.") (internal quotation omitted).

### c. The Alleged Trade Secrets Were Extinguished By Their Public Disclosure In U.S. Patent Applications Published Or Otherwise Made Publicly Available On January 9, 2020

The seven alleged trade secrets disclosed in the Final ID were **all** disclosed in the July 6, 2018 '528 Provisional and July 8, 2019 '305 Application, both of which were publicly available to the world as of January 9, 2020.  Zeidman Dec., ¶¶20-21.  The latter by way of the '816

Publication; the former by way of the USPTO's Public PAIR system. Ahearn Dec., Exs. D, E. The December 28, 2021 '416 Patent disclosed the alleged trade secrets worldwide for a third time. *Id.*

Plaintiff has taken the position in this case that source code is not part of any of the seven alleged trade secrets being asserted in this case. Ahearn Dec., Ex. N (PI Hearing Tr.) at 30:1-5 ("[w]e never alleged an issue of source code, Your Honor, so that's not an issue. Source code is not the issue here. [W]e're not alleging access to source code."); ECF 236 (Opp. to Mot. Summ. Judg.) at 26:21-22 (█████████████████████████████████████████████████████████████).

Thus, although Wright Flood asserts that Plaintiff's Final ID inadequately discloses the alleged trade secrets, Wright Flood understands the alleged trade secrets disclosed in the Final ID to apply to only the features and functions of the ImageKeeper System (i.e. what the ImageKeeper System does), not **how** those features and functions are implemented in the ImageKeeper System (i.e. not the underlying source code that implements the alleged trade secrets in the ImageKeeper System). Even assuming Plaintiff can claim trade secret protection to features and functions that have been in use in many industries for many years, as illustrated below, all of the features and functions of the seven alleged trade secrets were publicly disclosed in the '816 Publication and the '528 Provisional as of January 9, 2020. Zeidman Dec., ¶15:14-17 ("[t]he ImageKeeper System was analogous to electronic ticketing systems that have been used for many years in information technology and other industries where a ticket (or claim) is opened, assigned, addressed, and closed.") and ¶¶20-21.

                   ***i.   Alleged Trade Secret No. 1 Disclosed in '816 Publication and '528 Provisional***

Plaintiff's first alleged trade secret is generally described as the ████████████ ██████████████████████████████████████████████████████████████ Ahearn Dec., Ex. F (Final ID) at 16:13-19:21. Alleged trade secret 1 purportedly ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ *Id.*, Ex. F at 16:16-19; Zeidman Dec., ¶25.

Alleged trade secret 1 appears to comprise three different aspects that Plaintiff refers to as ███████████████ (Zeidman, Ex. B (Final ID) at 16:19-18:6), ████████████████ (*Id.* at 18:7-23), and ████████████████████████████ (*Id.* at 18:24-19:16).   Zeidman Dec., ¶26. However, these three different aspects are very closely related to a single aspect called ████ ██████.   Zeidman Dec., ¶26 and Ex. B.   The January 9, 2020 '816 Publication and the '528 Provisional that was publicly available as of January 9, 2020 through the USPTO's Public PAIR both disclose alleged trade secret 1 as described in the Final ID.   *Id.*, ¶¶27, 32 and Exs. B at 16:13-19:21, D, and E.

Paragraph [0037] of the '816 Publication discloses using "secure system log-in by users.   As the user receives claims to adjust, the adjuster will log into the system using his system credentials. The user management i.e. system manager will manage all users through a password system with permissions of groups of users, or individual users. . . All the data including the final estimate are preserved into the cloud system and stored with access provided through the secure, password system, user management, dashboard, third party data access and all associated APIs (Advanced Programming Interfaces)."   Zeidman Dec., ¶28 and Ex. E; *compare, e.g.*, *id.*, Ex. B (Final ID) at 16:19-25 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████); *see also id.*, Ex. B at 18:7-23 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

Similarly, Fig. 3 of the '816 Publication shows the login interface 305, which as described at Paragraph [0047] includes not only user information but also buttons for creating "new +" incidents and an option to "save" incidents.   Zeidman Dec., ¶29 and Ex E.   Paragraph [0136] states that "the architecture also allows domains and secure user groups for multiple simultaneous users with complete data separation under user management, user permission groups able to see data

simultaneously if they hold the correct approved system user permissions and/or credentials for their system domain or domains. That is, different users might be able to see different media assets and/or different incidents depending on permission levels and/or credentials associated with identifiers (e.g., usernames, names, email addresses, badge numbers, employee numbers, etc.) of those individuals." Zeidman Dec., ¶29 and Ex. E; *compare, e.g., id.*, Ex. B (Final ID) at 16:19-25

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████).

The '528 Provisional, likewise, at Paragraph [0078], discloses "[t]he system uses secure system log-in by users. As the user receives claims to adjust, the adjuster will log into the system using his system credentials. The user management i.e. system manager will manage all users through a password system with permissions of groups of users, or individual users." Zeidman Dec., ¶30 and Ex. F; *compare id.*, Ex. B (Final ID) at pp. 16:19-25, 18:7-23, and 18:24-28. Figure 37 of the '528 Provisional, likewise, discloses the sign-in process for the ImageKeeper System and shows the corresponding sign-in screens for the ImageKeeper System. Zeidman Dec., ¶31 and Ex. F.

### ii. Alleged Trade Secret No. 2 Disclosed in '816 Publication and '528 Provisional

Plaintiff's second alleged trade secret is generally described as the ████████████████
████████████████ Ahearn Dec., Ex. F (Final ID) at 19:23-21:8. Alleged trade secret 2
purportedly ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ *Id.* at 19:23-26; Zeidman Dec., ¶33. The
January 9, 2020 '816 Publication and the '528 Provisional that was publicly available as of January 9, 2020 through the USPTO's Public PAIR both disclose alleged trade secret 2 as described in the Final ID. Zeidman Dec., ¶¶34, 37 and Exs. B (Final ID) at 19:23-21:8, E, and F.

Figure 2 of the '816 Publication illustrates the available types of programmatic assignment of claims to adjusters. Zeidman Dec., ¶35 and Ex. E. Paragraph [0040] of the '816 Publication, likewise, discloses programmatic assignment of claims to adjusters. *Id.* Paragraph [0040] states,

"[t]he system also has a dynamic function to create both assigned claims versus created claims. Assigned claims are where the adjuster would have limited ability to modify the claim data, media or loss data. The Created claim would allow the owner/creator to manage everything about the claim and to manage all aspects of the claim with edit functions to edit the whole claim's data, media, estimate, loss forms, loss data, etc.. [...]  The claims assigned can be assigned to a particular adjuster and can be assigned automatically in specific groups or in a mass intelligent assignment process.  The digital device receives assignments through a preprogrammed or manual synchronization.  Menus are provided to service the adjuster on his digital device for workflow and visual or audio status indicator of all claims such as new, in process, waiting for follow up, completed, waiting for approval etc." *Id.*; *compare, e.g.*, *id.*, Ex. B (Final ID) at 19:23-26 and 20:2-12 (█████████████).

The '528 Provisional also discloses programmatic claim assignment to adjusters.  Zeidman Dec., ¶36 and Ex. F.  Figure 36 of the '528 Provisional is from the ImageKeeper Quick Start guide and demonstrates the download and installation sequence for new adjusters.  *Id.*  Paragraph [0081] of the '528 Provisional, likewise, discloses programmatic assignment of claims to adjusters.  *Id.*  Paragraph [0081] states, "[t]he system also has a dynamic function to create both assigned claims versus created claims. Assigned claims are where the adjuster would have limited ability to modify the claim data, media or loss data. The Created claim would allow the owner/creator to manage everything about the claim and to manage all aspects of the claim with edit functions to edit the whole claim's data, media, estimate, loss forms, loss data, etc." *Id.*; *compare, e.g.*, *id.*, Ex. B (Final ID) at 19:23-26 and 20:2-12 (██████████████).

   **iii.** ***Alleged Trade Secret No. 3 Disclosed in '816 Publication and '528 Provisional***

Plaintiff's third alleged trade secret is generally described as the ██████████ ████████████████████████████████████████████████████████ █████████████████████.  Ahearn Dec., Ex. F (Final ID) at 21:9-22:25.  Alleged trade secret 3 purportedly identifies ████████████████████████████████████████████████████ ███████████████████████████████████████

1   ████████████████████████████████████████████████████ *Id.* at 21:11-13; Zeidman

2   Dec., ¶38.  The January 9, 2020 '816 Publication and the '528 Provisional that was publicly

3   available as of January 9, 2020 through the USPTO's Public PAIR both disclose alleged trade

4   secret 3 as described in the Final ID.  Zeidman Dec., ¶¶39, 44 and Exs. B (Final ID) at 21:9-22:25,

5   E, and F.  Both applications refer to and disclose various APIs.  *Id.*, Exs. E and F.

6          The '816 Publication specifically refers to various APIs used in the ImageKeeper System.

7   Zeidman Dec., ¶¶40, 41 and Ex. E at [0037] and [0045].  Paragraph [0037] discloses all the "data

8   including the final estimate" that are "preserved into the cloud system and stored with access

9   provided through the secure, password system, user management, dashboard, third party data access

10  and all associated APIs (Advanced [sic] Programming Interfaces)."  *Id.*, ¶40 and Ex. E.  Paragraph

11  [0045] discloses, "[t]he incident titles, incident categorizing, insertion of comments, storage,

12  transmission and provides for system synchronization of the mobile device to cloud and the cloud

13  web portal and to the mobile devices.  All incidents and incident media and associated data i.e.

14  titles, categories, comments etc., are synchronized end to end with the entirety of associated data

15  and group incident's media captured, using its user screen selectable multiple media capture

16  source."  *Id.*, ¶41 and Ex. E.

17         The '528 Provisional, specifically Figures 13, 19, 21, 22, 26, 30, 31, 33, and 34, show an

18  interface between a web portal and cloud server system that is implicitly performed via an API as

19  explicitly described in the '528 Provisional.  Zeidman Dec., ¶42 and Ex. F.  Paragraph [0078] of the

20  '528 Provisional states, all the "data including the final estimate" that are "preserved into the cloud

21  system and stored with access provided through the secure, password system, user management,

22  dashboard, third party data access and all associated APIs (Advanced [sic] Programming

23  Interfaces)."  *Id.*  Paragraph [0086] discloses, "[t]he incident titles, incident categorizing, insertion

24  of comments, storage, transmission and provides for system synchronization of the mobile device to

25  cloud and the cloud web portal and to the mobile devices.  All incidents and incident media and

26  associated data i.e. titles, categories, comments etc., are synchronized end to end with the entirety of

27  associated data and group incident's media captured, using its user screen selectable multiple media

28  capture source."  *Id.*, ¶43 and Ex. F.

### iv. Alleged Trade Secret No. 4 Disclosed in '816 Publication and '528 Provisional

Plaintiff's fourth alleged trade secret is generally described as the ███████████████████████████████████████ Ahearn Dec., Ex. F (Final ID) at 23:1-24:23.  Alleged trade secret 4 purportedly ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.* at 23:3-8; Zeidman Dec., ¶45.  The January 9, 2020 '816 Publication and the '528 Provisional that was publicly available as of January 9, 2020 through the USPTO's Public PAIR both disclose alleged trade secret 4 as described in the Final ID.  Zeidman Dec., ¶¶46, 51 and Exs. B (Final ID) at 23:1-24:23, E, and F.

Paragraph [0034] of the '816 Publication describes the automated disposition of preliminary reports.  Zeidman Dec., ¶48 and Ex. E.  This paragraph  discloses "[a]dditional features integrated to the system are dynamic sketching tools to allow users to draw/sketch a property detail with measurement as an adjuster generates an on-site damage reports and adds Incident titles, it's [sic] category and voice to text, dynamic forms for data block inputs or keyboard entered comments along with the incident's media and subsequent media details including media title, media group(s), media description is fully integrated into the web dynamic report assembling process and into the reports when the reports function is activated, and a report is generated, saved as an example in PDF format and sent/transmitted via text, SMS, email or added to an assemblage of a larger report."  *Id.*  Figure 2 of the '816 Publication illustrates the generation of preliminary reports.  *Id.*, ¶47 and Ex. E.

The '528 Provisional also discloses the automated disposition of preliminary reports.  Zeidman Dec., ¶49 and Ex. F.  Figures 45 and 46 of the '528 Provisional shows the exact format of preliminary reports, including all the "prerequisites" for the adjusting firm.  *Id.*  Paragraph [00217] of the '528 Provisional further explains "[Figures] 36-48 concern an adjuster mobile application geared toward functionality that is useful for an insurance flood adjuster.  The adjuster's job is to go

to the property, record/document/verify the damage and prepare a claim estimate or scope of the damage and provide it back to the insurance company to pay the claim.  The whole methodology from the assignment of the claim including providing an automated preliminary report … automates [the] preliminary report and uses a four step process to capture[] certified media of the damage, add[] scope notes about the damage, complete[] an Advance Payment Request with electronic signature, [and] transmits it to the insured while adjuster is on-site."  *Id.*, ¶50 and Ex. F.

*v.*      ***Alleged Trade Secret No. 5 Disclosed in '816 Publication and '528 Provisional***

Plaintiff's fifth alleged trade secret is generally described as the ████████████ ████████████████████████████████████████████  Ahearn Dec., Ex. F (Final ID) at 24:24-26:19.  Alleged trade secret 5 appears to comprise five different aspects that Plaintiff refers to as ████████████ (Zeidman Dec., Ex. B (Final ID) at 25:1-6), ████████ (aka Photo Sheet Builder) (*Id.* at 25:7-18), ████████ (*Id.* at 25:19-24), ████████ (*Id.* at 25:25-26:3), ████████ (*Id.* at 26:4-8), and ████████[4] (*Id.* at 26:9-19).  Zeidman Dec., ¶52 and Ex. B.  The January 9, 2020 '816 Publication and the '528 Provisional that was publicly available as of January 9, 2020 through the USPTO's Public PAIR both disclose alleged trade secret 5 as described in the Final ID.  *Id.*, ¶¶53, 83 and Exs. B at 24:24-26:19, E, and F.

████████████████  For alleged trade secret 5, the Final ID states that a ████████ ████████████████████████████████████████  Zeidman Dec., ¶54 and Ex. B (Final ID) at 25:1-6.  It further states, ████████████████████████████████████████████  *Id.*

The '816 Publication discloses a GUI for a mobile application.  Zeidman Dec., ¶56 and Ex. E at [0101].  Paragraph [0101] states "[u]pon the application download, a user can insert username

---

[4] It is not clear how this aspect of alleged trade secret 5 differs from alleged trade secret 4 (disposition of preliminary reports).  This broad description appears to already be included in alleged trade secret 4.  Zeidman Dec., ¶83.

1    and password that was provided previously upon system registration to sign into a system. Another

2    interface may appear listing a number of incidents contained in the system by or otherwise

3    accessible to the logged in user." *Id.* The '528 Provisional, likewise, includes virtually the entire

4    ImageKeeper System Quick Start Guide, including many figures that disclose a GUI for a mobile

5    application. *Id.*, ¶¶31, 55 and Ex. F at Figs. 36-57 (Quick Start Guide).

6    ███████████████████████████████████████████████████████

7    For alleged trade secret 5, the Final ID states that ███████████████████████████

8    ███████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████

10    Zeidman Dec., ¶58 and Ex. B at 25:7-9.

11    The '816 Publication discloses certified media reports in numerous places. Zeidman Dec.,

12    ¶¶60-67 and Ex. E. Paragraph [0033] states that "the system will produce claim loss reports with

13    certified media with media titles, label, captions, notes, groups all with precision GPS information

14    all integrated into a PDF or other computer format for increased efficiency in performing an

15    adjuster on-site claims loss report. Additional key elements of the system include a fully integrated

16    documentation and dynamic visual GPS enabled title, categorized, descriptive media dialog/notes

17    integrated multimedia report generation system incorporating a programmable estimating system

18    with preservation features." *Id.*, ¶61 and Ex. E; *see also id.*, ¶¶60-67 and Ex. E at [0034]

19    ("additional features … fully integrated into the web dynamic report assembling process and into

20    the reports when the reports function is activated, and a report is generated…."), [0040] ("…allow

21    the owner/creator to manage everything about the claim and to manage all aspects of the claim with

22    edit functions to edit the whole claim's data, media, estimate, loss forms. loss data. etc."), [0058]

23    ("[e]diting media provides a number of possible processes, including editing incident media title,

24    editing incident media group, search, selecting 'enter a new group,' selecting from group list view,

25    editing text via keyboard/voice to text, editing media notes, selecting and moving media from one

26    group to another, and archiving the media (e.g., in the web portal)."), and [0097] ("[a] human using

27    a computer, software and computer process may add, change, modify, edit or remove a voice to

28    text, voice to text title, note, description, caption, to or from a media. Additionally, the media may

1  be altered or modified, for example using photo editing software and/or video editing software

2  and/or audio editing software.").

3         The '528 Provisional also discloses alleged trade secret 5 in numerous places. Zeidman Dec.,

4  ¶59 and Ex. F.  Fig. 2 describes "Photo sheet generation."  *Id.*  Fig. 4 boxes 420 ("Add Media to

5  Incident"), 425 ("Add context for media"), 440 ("Edit Incident Media"), and the last bullet of 445

6  ("Sketches, drawings, photos, video, audio, and other media") all describe configuring, laying out,

7  and creating or generating detailed photo sheets or reports containing certified media captures

8  utilizing an ImageKeeper mobile application. *Id.*; *see also* Fig. 47 ("Photo Certification Validation

9  (Chain-of-Custody)"), Fig. 52 ("Documenting the Incident with Media (Photos, Videos & Audio)"),

10  Fig. 53 ("Working with Media - Groups (Media Segregation Groups)"), and the description of Fig.

11  15 in paragraph [0022] ("FIG. 15 illustrates a media security certification, authentication, and

12  verification system as performed by the user device mobile application or by the web portal").

13  ███████████

14         For alleged trade secret 5, the Final ID discloses the ████████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17  ██████████████████████████████  Zeidman Dec., ¶68 and Ex. B at 25:19-

18  24.

19         Paragraph [0027] of the '816 Publication discloses and describes the ability to capture and

20  save individual frames from a video capture.  Zeidman Dec., ¶71 and Ex. E (describing Fig. 1

21  "media capture device").  Paragraphs [0063]-[0065] discloses and describes a GUI that allows

22  reviewing and cycling through all of the certified media captures and related data for a given item.

23  *Id.*, ¶72 and Ex. E (describing Fig. 5B "user interface").  Paragraph [0068] of the '528 Provisional

24  also discloses and describes providing a member with the ability to capture and save individual

25  frames.  *Id.*, ¶69 and Ex. E.  And Figures 41 and 54 of the '528 Provisional are from the

26  ImageKeeper System Quick Start Guide describing reviewing and cycling through all of the certified

27  media captures and related data.  *Id.*, ¶70 and Ex. E.

28

For alleged trade secret 5, the Final ID discloses

Zeidman Dec., ¶74 and Ex. B at 25:25-26:3.

Figure 2 of the '816 Publication discloses a "[m]obile enabled media and capture system" that includes a "digital storyboard." Zeidman Dec., ¶76 and Ex. E. Figure 11 discloses a storyboard user interface. *Id.* And paragraphs [0089] and [0092] disclose an "Open Storyboard." *Id.* The '528 Provisional makes these same exact disclosures. *Id.*, ¶75 and Ex. F at Figs. 2 and 13 and Paragraphs [00127], [00134], and [00222].

Lastly, for alleged trade secret 5, the Final ID discloses

Zeidman Dec., ¶78 and Ex. B at 26:4-8.

Paragraph [0097] of the '816 Publication discloses a "system [that] has an integral audit function that shows a detailed record to the user each time the media has been moved, changed, organized, edited, printed, or changed in any way." Zeidman Dec., ¶80 and Ex. E. The '528 Provisional makes this same exact disclosure. *Id.*, ¶79 and Ex. F.

### vi.   *Alleged Trade Secret No. 6 Disclosed in '816 Publication and '528 Provisional*

Plaintiff's sixth alleged trade secret is generally described as a way to

Ahearn Dec., Ex. F (Final ID) at 26:21-28:12. Alleged trade secret 6 discloses source code for the so-called                    *Id.*at 27:4-28:5. However, counsel for Plaintiff has told the Court multiple times that source code is **not** alleged to have been misappropriated by Wright Flood. *Id.*, Ex. N (PI Hearing Tr.) at 30:1-5 ("[w]e never alleged an issue of source code, Your Honor, so that's not an issue. Source code is not the issue here. [W]e're

not alleging access to source code."); *see also* ECF 236 (Opp. to Mot. Summ. Judg.) at 26:21-22

(█████████████████████████████████████████████). Thus, Wright

Flood assumes that the general concept of a loss reserve estimator is the alleged trade secret here.

Zeidman Dec., ¶86.  And the general concept of a loss reserve estimator is clearly disclosed in the

January 9, 2020 '816 Publication and the '528 Provisional that was publicly available as of January

9, 2020 through the USPTO's Public PAIR.  *Id.*, ¶¶85, 89.

Figure 2 of the '816 Publication and the '528 Provisional both show "loss estimating" as

part of the ImageKeeper System.  Zeidman Dec., ¶87 and Exs. E and F.  Paragraph [0037] of the

'816 Publication and Paragraph [0078] of the '528 Provisional both disclose that "[t]he media data,

loss data, contents data, adjuster labor for the onsite loss investigation data is all integrated and

processed with the continually updated cost estimating portion of the system to provide all parties

involved in the loss … an insurance estimate…."  *Id.*, ¶88 and Exs. E and F.

> ### vii.     *Alleged Trade Secret No. 7 Disclosed in '816 Publication and '528 Provisional*

Plaintiff's seventh alleged trade secret is generally described as ███████████████

████████████  Ahearn Dec., Ex. F (Final ID) at 28:14-29:10. Plaintiff's identifies alleged

trade secret 7 as a way to ██████████████████████████████████████████

████████  *Id.* at 28:14-15.  The January 9, 2020 '816 Publication and the '528

Provisional that was publicly available as of January 9, 2020 through the USPTO's Public PAIR

both disclose alleged trade secret 7 as described in the Final ID. Zeidman Dec., ¶¶91, 96.

Figure 1 of the '816 Publication discloses "an overview of a cloud server storage system that

provides secure synchronization between a mobile device media capture system and a server-based

web service accessible through a web portal."  Zeidman Dec., ¶92, Ex. E at Fig. 1 and [0026].

Figure 2 discloses "secure synchronization using the cloud server storage system in the context of

digital media concerning an insurance claim."  *Id.* at Fig. 2 and [0032]; *see also id.* at Fig. 11.  The

'528 Provisional contains these same disclosures.  *Id.*, Ex. F at Figs. 1 and 2 and [0006] and [0007];

*see also Id.* at Fig.13.  Figures 13 and 15 of the '816 Publication further shows the types of

information associated with a claim that are updated to the cloud server system.  *Id.*, Ex. E; *see also*

*id.*, Ex. F at Fig. 34 (same).  Since APIs are the common method for accessing a cloud server, it would be understood that these updates would typically be made via an API.  *Id.*

Further, both the '816 Publication and '528 Provisional disclose "secure synchronization using the cloud server storage system in the context of digital media concerning an insurance claim."  Zeidman Dec., ¶93 and Exs. E at [0032] and F at [0067]; *see also id.*, ¶94 and Exs. E at [0045] and F at [0086] ("provides for system synchronization of the mobile device to cloud and the cloud web portal and to the mobile devices"); *see id.*, ¶95 and Exs. E at [0072] and F at [00111] ("[t]he user, at any time, can complete a system synchronization, and all data will be synchronized across both the cloud and on the digital device within or outside a domain structure.").

## 2. THE ALLEGED TRADE SECRETS WERE ABANDONED IN EARLY 2020 AND WERE OBSOLETE AS OF AUGUST 12, 2020

Wright Flood seeks summary judgment that the alleged trade secrets were abandoned by Plaintiff in early 2020 and were obsolete as of August 12, 2020.  As a result, any rights that existed in the alleged trade secrets, including any alleged misappropriation or damages, from this date forward are extinguished.

Obsolete information cannot be a trade secret.  *Fox Sports Net N., L.L.C. v. Minnesota Twins P'ship*, 319  F.3d  329,  336  (8th  Cir.  2003)  ("[a]s  the  district  court observed, obsolete information cannot form the basis for a trade secret claim because the information has no economic value"); *Taylor v. Babbitt*, 760 F. 2d 80, 88–89 (D.D.C. 2011) ("…obsolete information that provides no competitive advantage is not commercially valuable and cannot constitute a trade secret." (*citing Fox Sports Net North, LLC*, 319 F.3d at 336)); *Ruckelshaus*, 467 U.S. at 1011, n.15 ("[w]e emphasize that the value of a trade secret lies in the competitive advantage it gives its owner over competitors.").  The undisputed facts in the case indicate that the alleged trade secrets disclosed in the Final ID were obsolete as of August 12, 2020.

Plaintiff has admitted under oath that they abandoned all use of the alleged trade secrets in the new ImageKeeper System in early 2020.  Plaintiff, in its corporate deposition, testified that they

Ahearn Dec., Ex. I (Feb. 22, 2022, Dep. M. Patterson) at 161:15-

162:4; 165:14-166:18 and Ex. 15.  Plaintiff also testified that █████████████

███████████████████████████████████████████████████████████████ *Id.*

at 165:21-166:18.  Plaintiff further testified that ████████████████████████

██████████  *Id.* at 166:19-22.  Plaintiff affirmed that the new ImageKeeper System did not, and

does not, contain the alleged trade secrets:

> Q:   ███████████████████████████████████
>
> ████████████████████████████████████████
>
> ███████████████████████████
>
> A:   ██████████   (emphasis added).

Ahearn Dec., Ex. I (Feb. 22, 2022 Dep. M. Patterson) at 166:23-167:4.

It is true that "[a]s a general matter, subsequent generations of technology do not necessarily

render the prior generations obsolete."  *Dow Corning Corp. v. Jie Xiao*, 283 F.R.D. 353, 354 (E.D.

Mich. 2012).  Indeed, there are many examples of companies selling multiple generations of a

product.  *Id.*  In this case, however, Plaintiff testified that ████████████████████████████

███████████████████████████████████████████████████████████████

> Q:   ███████████████████████████████████
>
> ████████████████████████████████████████
>
> A:   ███
>
> …
>
> Q:   ████████████████████████████████████
>
> ███████
>
> A:   ██████████
>
> Q:   ███████████████████████████████
>
> A:   ████████████████████
>
> Q:   █████████████████████████████████
>
> ████████████████████████████████████
>
> A:   ██████████
>
> …





Ahearn Dec., Ex. J (Feb. 23, 2022 Dep. M. Patterson) at 123:9-124:24.

Here, Plaintiff's total abandonment of the alleged trade secrets since early 2020 render them obsolete. *MicroStrategy, Inc. v. Business Objects, S.A.,* 661 F.Supp.2d 548, 555 (E.D.Va.2009) (finding that a document was not worthy of trade secret protection because "the products it references have not been on the market for over half a decade…."); *Applied Indus. Materials Corp. v. Brantjes,* 891 F.Supp. 432, 438 (N.D.Ill.1994) (refusing to extend trade secret protection to information that was "so outdated that it lack[ed] current economic value")

Further, as of August 12, 2020, Wright Flood discontinued use of the old ImageKeeper System.  Ahearn Dec., Ex. L (Wright Flood's Supp. Resp. and Obj. to Plaintiff's Interrogatory 5 and Second Supp. Resp. and Obj. to Plaintiff's Interrogatory No. 6) at 15:13-16 and 21:18-21. Even assuming the Wright Flood Application contained the alleged trade secrets, Wright Flood also discontinued use of the Wright Flood Application as of August 12, 2020. *Id.*  And Wright Flood has no plans to revive the Wright Flood Application, or any mobile adjuster application, regardless of the outcome of this matter. *Id.*  Thus, any value the old ImageKeeper System might have had while it was still being used was extinguished when Wright Flood (apparently the very last customer) ceased using the ImageKeeper System on August 12, 2020.

Plaintiff's abandonment of the alleged trade secrets in early 2020 and Wright Flood's discontinued use of the old ImageKeeper System, as well as the accused Wright Flood Application, on August 12, 2020 strongly indicates a lack of any value in the alleged trade secrets after August 12, 2020.  These undisputed facts demonstrate in stark terms that the alleged trade secrets were obsolete after this date.  As a result, summary judgment is warranted.

1

**B.      COUNTS 3 AND 7 THROUGH 11 ARE PREEMPTED BY THE NEVADA UNIFORM TRADE SECRETS ACT**

2

Counts 3 and 7 through 11 are based on the same facts Plaintiff alleges in support of its state

3

and federal trade secret claims.  For this reason, these counts are **preempted** by the Nev. UTSA and

4

summary judgment in favor of Wright Flood is proper.

5

Wright Flood previously moved to dismiss these counts on the grounds that they were

6

preempted by the Nev. UTSA.  ECF 75, 78, 83, 158, and 170.  The Court denied Wright Flood's

7

motion to dismiss.  ECF 170.  Regarding preemption under the Nev. UTSA, the Court found that

8

Fed. R. Civ. Proc. 8 provides that "Plaintiff may plead statutory and non-statutory claims in the

9

alternative, even if non-statutory claims are duplicative of the misappropriation of trade secrets

10

claims."  *Id.* at 8:20-22.  Because Plaintiff amended the complaint to alternatively (and

11

formulaically) plead allegations that concern "confidential information that may not constitute a

12

trade secret," the Court held that "dismissal is premature **at this stage of the proceeding**."  ECF 170

13

at 8:20 (emphasis added); Ahearn Dec., Ex. C (Am. Comp.) at ¶¶134-137, 154, 159, and 165.

14

Since the Court's ruling on Wright Flood's motion to dismiss, the parties have engaged in

15

and completed extensive discovery.  Over the course of discovery, Plaintiff failed to develop or

16

discover any facts in the record, either in documents, interrogatory responses, or in deposition

17

testimony, to support the allegations that Wright Flood took any "confidential information that may

18

not constitute a trade secret."  Ahearn Dec., Ex. C (Am. Comp.) at ¶¶134-137, 154, 159, and 165.

19

As a result, the allegations contained in Counts 3 and 7-11 remain indistinguishable from Plaintiff's

20

trade secret-based counts and are preempted by the Nev. UTSA.

21

**1.      THE NEV. UTSA PREEMPTS COUNTS 3 AND 7 THROUGH 11**

22

The Nev. UTSA "displaces conflicting tort, restitutionary, and other law of this state

23

providing civil remedies for misappropriation of a trade secret."  NRS 600A.090.  The Nevada

24

Supreme Court has explained that "[t]he plain language of NRS 600A.090 precludes a plaintiff from

25

bringing a tort or restitutionary action 'based upon' misappropriation of a trade secret beyond that

26

provided by the UTSA."  *Frantz v. Johnson*, 999 P.2d 351, 357 (Nev. 2000).  To determine whether

27

a claim is "based upon" trade secret misappropriation, courts consider whether the claim arises from

28

1   the same, "single factual episode" as the plaintiff's trade secret claims.  *Menalco v. Buchan*, No.

2   2:07–CV–01178–PMP–PAL, 2010 WL 428911, at *22 (D. Nev. Feb. 1, 2010); *see also SVI, Inc. v.*

3   *Supreme Corp.*, No. 2:16–cv–01098–JAD–NJK, 2016 WL 7190548, at *7 (D. Nev. Dec. 12, 2016)

4   ("[w]here the factual circumstances underlying a plaintiff's tort claims are *completely dependent* on

5   facts concerning misappropriation of trade secrets, as many of [Plaintiff]'s tort claims are currently

6   pled, those claims are barred by the UTSA.") (emphasis added).  In *Menalco*, the court granted

7   summary judgment in favor of the defendants because the plaintiff's civil conspiracy claim was

8   preempted by the Nev. UTSA.  *Menalco*, 2010 WL 428911 at *22.  It explained that:

> Although Plaintiffs argue this claim is not duplicative of the misappropriation of trade
> secrets claim because it involves overt acts in furtherance of the conspiracy that do
> not involve a trade secret, the object and purpose of the alleged conspiracy is the
> same as the misappropriation of trade secrets claim. The basis of the conspiracy is
> that Defendants allegedly agreed to harm Plaintiffs by stealing the Selektpoints trade
> secrets to market the program as their own. That they may have taken acts in
> furtherance of this conspiracy that do not involve misappropriation of a trade secret
> does not transform the overall nature of the claim.

13   *Id.*  Thus, the Nev. UTSA preempts a cause of action where the "object and purpose" of the alleged

14   wrongdoing is the same as that alleged under the plaintiff's trade secret cause of action.  *Id.*  NRS

15   600A.090, therefore, prevents parties from circumventing the Nev. UTSA's requirements by

16   couching what is truly a trade secret claim in another cause of action.  In so doing, the preemption

17   provision ensures that the Nev. UTSA remains the sole remedy for trade secret misappropriation.

18      The causes of action set forth in counts 3 and 7-11 of Plaintiff's Amended Complaint arise

19   from the same factual episode as Plaintiff's claims under the Nev. UTSA.  These claims are based in

20   the same alleged wrongdoing and, at their core, relate only to Plaintiff's assertion that its purported

21   trade secrets were misappropriated.  Thus, these claims are preempted by the Nev. UTSA.

22      Plaintiff's trade secret claims are based on its allegations that Wright Flood "obtained access

23   to ImageKeeper's System and the underlying Trade Secrets through improper means."  Ahearn Dec.,

24   Ex. C (Am. Comp.) at ¶78.  Plaintiff asserts that "Wright Flood … agreed to strict confidentiality

25   and non-disclosure obligations … while never having the intention of complying with its terms while

26   simultaneously providing Evoke access to the ImageKeeper System," and that "Wright Flood . . .

27   deliberately bypassed all security and authorization requirements by providing to … Evoke, . . its

28

unique administrator login credentials that ImageKeeper had registered to and only to Wright

Flood's Chief Information Officer." *Id.* According to Plaintiff, "Evoke (at Wright Flood's

direction) … without authorization or approval … accessed, used, and tested the ImageKeeper Portal

and Adjuster Application … for the sole purpose of misappropriating, misusing, copying,

replicating, and reverse engineering the Trade Secrets, as well as marketing (as their own)

ImageKeeper's technology…." *Id.* Counts 3 and 7-11 are "completely dependent" on the same

factual allegations and are, therefore, preempted.

### 2. PLAINTIFF'S INFRINGEMENT OF TRADE SECRETS CLAIM (NRS 603.080, 603.050) IS PREEMPTED BY THE NEV. UTSA

Plaintiff's infringement of trade secrets claim is based on its claim that "Defendants' actions

constitute and infringement of trade secrets." Ahearn Dec., Ex. C (Am. Comp.) at Count 3, ¶¶90-96.

On its face, this claim is "based upon" Plaintiff's trade secret misappropriation claims. *Frantz*, 999

P.2d at 357. Indeed, Plaintiff's responses to discovery indicate that this claim is based on the same

factual scenario underlying the trade secret claims. In support of its Nev. UTSA claim, Plaintiff

asserts that ████████████████████████████████████████████

████████████████████████████████████████ Ahearn Dec., Ex. M (Second

Supplemental Response to Interrogatory No. 7) at 45:12-13. Plaintiff makes identical assertions

with respect to its infringement of trade secrets claim. *Id.* at 46:11-12. Plaintiff even requests

identical damages for this claim and for its claim under the Nev. UTSA. *Compare id.* at 46:2-7 *with*

*id.* at 45:3-7 and 45:16-18. There are no substantive differences between Plaintiff's Nev. UTSA

claims and its infringement of trade secret claims. It is "based upon" the Nev. UTSA claim. *Frantz*,

999 P.2 at 357. The infringement of trade secrets claim is, therefore, preempted by the Nev. UTSA.

*Id.*; NRS 600A.090.

### 3. PLAINTIFF'S UNLAWFUL ACTS REGARDING COMPUTERS CLAIM (NRS 205.4765, 205.477, 205.511) IS PREEMPTED BY THE NEV. UTSA

Plaintiff's claim under Nevada's unlawful acts regarding computers statute is based on the

allegation that Wright Flood "without authorization, used, transferred, took, made copies of,

obtained or attempted to obtain access to . . . the ImageKeeper System." Ahearn Dec., Ex. C (Am.

Comp.) at Count 7, ¶¶134-139. It is immaterial that Plaintiff claims that the ImageKeeper System

"includes confidential information that may not constitute a trade secret"—the claim arises from the same "factual episode" as Plaintiff's trade secret claims, and the "object and purpose" of the alleged wrongdoing is indistinguishable. *See Menlaco*, 2010 WL 428911, at *22. Moreover, Plaintiff has never specified what non-trade secret "████████████████" it believes was "████ ████" Ahearn Dec., Ex. M (Second Supplemental Response to Interrogatory No. 7) at 50:16-19. This claim is therefore preempted by the Nev. UTSA. *Menlaco*, 2010 WL 428911, at *22; *Frantz*, 999 P.2d at 357; NRS 600A.090.

### 4. PLAINTIFF'S DECEPTIVE TRADE PRACTICES (NRS 41.600) CLAIM IS PREEMPTED BY THE NEV. UTSA

Additionally, like its trade secret claims, Plaintiff bases its deceptive trade practices claims on allegations that Wright Flood marketed the ImageKeeper System as its own. *Compare* Ahearn Dec., Ex. C (Am. Compl.) at Count 8, ¶¶143 *with id.* at ¶ 78. Again, it is immaterial that Plaintiff asserts that the ImageKeeper System "includes confidential information that may not constitute a trade secret"—the claim arises from the same "factual episode" as Plaintiff's trade secret claims, and the "object and purpose" of the alleged wrongdoing is indistinguishable. *See Menlaco*, 2010 WL 428911, at *22. Specifically, Plaintiff's Nev. UTSA and deceptive trade practices claims are both based on the alleged "clone system" and use of purported "trade secret technology." Ahearn Dec., Ex. C (Am. Compl.) at ¶¶78, 143; *id.*, Ex. M (Second Supplemental Response to Interrogatory No. 7) at 51:8-12. The deceptive trade practices claim is preempted by the Nev. UTSA. *Menlaco*, 2010 WL 428911, at *22; *Frantz*, 999 P.2d at 357; NRS 600A.090.

### 5. PLAINTIFF'S UNFAIR TRADE PRACTICES CLAIM (NRS 603.080, 603.040) IS PREEMPTED BY THE NEV. UTSA

Plaintiff's unfair trade practices claims are also tied to the alleged facts upon which its trade secret claims are based. Plaintiff claims that "Defendants, either directly or through others, gained access to data stored in a computer, the ImageKeeper System, with the intent to convert the data to their own use, which is an unfair trade practice." Ahearn Dec., Ex. C (Am. Compl.) at Count 9, ¶154. This allegation is identical to that lodged in support of Plaintiff's trade secret claims. *Id.* at ¶78. Again, it is immaterial that Plaintiff asserts that the ImageKeeper System "includes confidential information that may not constitute a trade secret"—the claim arises from the same

"factual episode" as Plaintiff's trade secret claims, and the "object and purpose" of the alleged

wrongdoing is indistinguishable. *See Menlaco*, 2010 WL 428911, at *22. Namely, Plaintiff claims

that the "unfair trade practice" at issue is Wright Flood's alleged ████████████████

████████████████████████████████████████████ and asserts that it is entitled to

unjust enrichment damages for Wright Flood's alleged ████████████████████████

████████████████████████████████ Ahearn Dec., Ex. M (Second

Supplemental Response to Interrogatory No. 7) at 52:22-24 (emphasis added). There is no doubt

that Plaintiff's unfair trade practices claim is "based upon" its trade secrets claim and is therefore

preempted. *Frantz*, 999 P.2d at 357.

### 6. PLAINTIFF'S CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS PREEMPTED BY THE NEV. UTSA

Plaintiff's claims relating to the implied covenant of good faith and fair dealing are also

clearly "based upon" its trade secret claims. *Frantz*, 999 P.2d at 357. Plaintiff alleges that "Wright

Flood abused its relationship with Plaintiff in order to gain access to Plaintiff's trade secret

information, as well as confidential information that may not constitute a trade secret." Ahearn

Dec., Ex. C (Am. Comp.) at Count 10, ¶159. This allegation is, on its face, based upon the trade

secret claims. *Id.*; *Frantz*, 999 P.2d at 357. Plaintiff's discovery responses further indicate that this

claim is based on the same facts that underlie its Nev. UTSA claim. Ahearn Dec., Ex. M (Second

Supplemental Response to Interrogatory No. 7) at 53:13-16 (alleging that Wright Flood sought ██

████████████████████████████████████████████████████████

████████████████) (emphasis added). Because Plaintiff's breach of the implied covenant of

good faith and fair dealing claim is "based upon" the trade secret claims, this claim is preempted.

### 7. PLAINTIFF'S UNFAIR COMPETITION/BREACH OF THE DUTY OF LOYALTY CLAIM IS PREEMPTED BY THE NEV. UTSA

The same is true of Plaintiff's unfair competition/breach of the duty of loyalty claim, which

explicitly asserts that "Wright Flood breached its duty of loyalty by illegally copying and disclosing

ImageKeeper's Trade Secrets and confidential information. . . ." Ahearn Dec., Ex. C (Am. Comp.)

at Count 11, ¶164. Plaintiff's discovery responses further indicate that this claim and the Nev.

UTSA claim are based on an identical underlying factual scenario. *Id*, Ex. M (Second Supplemental

1    Response to Interrogatory No. 7) at 54:15-18 (alleging that Wright Flood ███████

2 ███████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ████████████████████████████ (emphasis added).

5      "[W]here a plaintiff alleges claims for . . . unfair competition that are duplicative of a

6 misappropriation of trade secrets claim, those claims are precluded by [the] UTSA." *Acclaim*

7 *Lighting, Inc. v. Bruck*, No. 2:17-cv-00147-RFB-GWF, 2018 WL 11409433, at *8 (D. Nev. Sept.

8 24, 2018). Because this claim is based on the same factual allegations as Plaintiff's Nev. UTSA

9 claims, and there is "no way to strip the misappropriation of trade secrets claims from this tort

10 claim," it is preempted. *Id.*; *Menalco*, 2010 WL 428911, at *22; *Frantz*, 999 P.2d at 357; NRS

11 600A.090.

12      Just as Plaintiff's operative pleading indicates that the aforementioned claims are based in

13 identical facts as those which support the trade secret claims, so too does the evidence—or lack

14 thereof—presented by Plaintiff in support of its causes of action. There is no evidence in the record

15 to support the causes of action cited in counts 3 and 7-11, outside of the evidence that Plaintiff has

16 purported to introduce in favor of its trade secret claims. Instead, the factual record is dominated by

17 Plaintiff's purported trade secret claims. Under these circumstances, it is evident that the causes of

18 action recited in counts 3 and 7-11 arise out of the same alleged wrongdoing and the same set of

19 facts as Plaintiff's purported trade secret claims. These claims are therefore preempted by

20 NRS600A.090, and summary judgment in favor of Wright Flood is proper.

21 **V.   CONCLUSION**

22      For the reasons set forth above, Wright Flood respectfully requests the Court enter summary

23 judgment in favor of Wright Flood in accordance with the undisputed facts and argument above.

24

25 Dated: March 24, 2023                DUANE MORRIS LLP

26

27                              By:___/s/ *Terry W. Ahearn*_____
                                Terry W. Ahearn

28                                 Attorney for Defendant *Wright National Flood Insurance Services LLC*

**PROOF OF SERVICE**

I hereby certify that I am a citizen of the United States and am employed in Clark County, where this mailing occurs. I am over the age of eighteen years and not a party to the within entitled action; my business address is 2475 Hanover Street, Palo Alto, CA 93404.

On March 24, 2023, I served the document described as **DEFENDANT WRIGHT NATIONAL FLOOD INSURANCE SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT** on the interested party(ies) in this action:

H. Stan Johnson, Esq.
Steven B. Cohen, Esq.
COHEN JOHNSON LLC
375 E. Warm Springs Road, Suite 104
Las Vegas, NV 89119
Tel: 702-823-3500
Fax: 702-823-3400
Email: sjohnson@cohenjohnson.com
Email: scohen@cohenjohnson.com

Donald L. Prunty
Glenn F. Meier
Bethany L. Rabe
GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive, Suite 600
Las Vegas, NV 89135
Tel: 702.792.3773
Fax: 702.792.9002
Email: pruntyd@gtlaw.com
Email: meierg@gtlaw.com
Email: rabeb@gtlaw.com

Colby B. Springer, Esq.
Miya Yusa, Esq.
POLSINELLI LLP
Three Embarcadero Center, Suite 2400
San Francisco, CA 94111
Tel: 415.248.2100
Fax: 415.247.2101
Email: cspringer@polsinelli.com
Email: myusa@polsinelli.com

F. Christopher Austin
WEIDE & MILLER, LTD.
10655 Park Run Drive, Ste. 100
Las Vegas, NV 89144
Tel: 702.382.4804
Fax: 702.382.4805
Email: caustin@weidemiller.com

☐  **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Las Vegas, Nevada, in the ordinary course of business.

☐  **BY FEDERAL EXPRESS:** I served said document(s) to be delivered on the same day to a courier or driver authorized by Federal Express to receive documents, in an envelope or package designated by Federal Express.

☒  **BY ELECTRONIC SERVICE:** I served a true copy, with all exhibits, electronically on designated recipients via electronic transmission of said document(s) as provided under Federal Rules of Civil Procedure.

/s/  *Andrew Hanna*
_____

An employee of DUANE MORRIS LLP