1

2 **UNITED STATES DISTRICT COURT**

3 **DISTRICT OF NEVADA**

4 ImageKeeper LLC,                                    Case No. 2:20-cv-01470-CDS-NJK

5                        Plaintiff                    **Order Resolving Motions for Summary**
                                                      **Judgment and Motions to Seal**
6     v.

7 Wright National Flood Insurance                    [ECF Nos. 314, 316, 319, 320, 341, 342, 343]
  Services LLC, et al.,
8

9                        Defendants

10

11          This is a trade secret misappropriation case. Plaintiff ImageKeeper LLC brings twelve

12 causes of action against defendants Wright National Flood Insurance Services and Evoke

13 Technologies Private Limited: trade secret misappropriation under 18 U.S.C. § 1836 (Defend

14 Against Trade Secrets Act (DTSA)) against both defendants (Count 1); trade secret

15 misappropriation under Nevada Revised Statute § 600A.010 (Nevada Uniform Trade Secrets Act

16 (NUTSA)) against both defendants (Count 2); infringement of trade secrets under NRS

17 603.080, 603.050 against both defendants (Count 3); Deceptive Trade Practices, NRS  41.600

18 against Wright only (Count 8); Unfair Trade Practices, NRS 603.080, 603.040 against both

19 defendants (Count 9); unfair competition/breach of duty of loyalty against Wright only (Count

20 11); Stored Communications Act (SCA), 18 U.S.C. §§ 2701, 2707, against both defendants (Count

21 5); Computer Fraud and Abuse Act (CFAA), 18 U.S.C § 1030, against both defendants (Count 6);

22 Unlawful Acts Regarding Computers, NRS 205.4765, NRS 205.477, and NRS 205.511 (Nevada

23 Computer Crimes Law (NCCL)), against both defendants (Count 7); breach of contract against

24 Wright only (Count 4); breach of the implied covenant of good faith and fair dealing against

25

26

Wright only (Count 10); and breach of contract against Evoke only (Count 12).[1] First am. Compl., ECF No. 68. Wright moved for summary judgment on all the claims against it (Claims 1 through 11). ECF No. 319.[2] Evoke joined the motion. ECF No. 320. Evoke also separately moves for summary judgment on all counts against it (Counts 1, 2, 3, 5, 6, 7, 9, and 12). ECF No. 314; ECF No. 316 (sealed).[3] ImageKeeper has also moved to seal its oppositions and some corresponding exhibits to Evoke's motion and Wright's motion. ECF Nos. 342, 343. For the following reasons, I grant in part and deny in part the motions for summary judgment. I also grant Wright's motion to seal (ECF No. 341) and ImageKeeper's second renewed motion to seal (ECF No. 343), and grant in part ImageKeeper's first renewed motion to seal (ECF No. 342).

## I.    Background

ImageKeeper develops mobile applications and secure image capturing technology licenses. Am. compl., ECF No. 68 at ¶ 3. As relevant to this case, it developed software to track, prepare, and process flood insurance claims, called the ImageKeeper's Flood Claim Service System (the "ImageKeeper System"). *Id.* The ImageKeeper System comprises a secure portal to the ImageKeeper Cloud and a mobile adjuster application ("Adjuster Application"). *Id.*

In 2013, ImageKeeper contracted with Wright to: (1) provide ImageKeeper's "proprietary technology and overall Client and Server system design and development leadership;" (2) "perform all necessary hardware, software module design, development, acquisition, integration, verification and test[ing];" and (3) to work on the "establishment of the specifications." *Id.* at ¶ 19 (citing ECF No. 30-1 (2013 Term Sheet)). In 2016, Wright began using the ImageKeeper

---

[1] Written differently, ImageKeeper levies Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11 against Wright (all but Count 12) and Counts 1, 2, 3, 5, 6, 7, 9, and 12 against Evoke (all but Counts 4, 8, 10, and 11). Therefore, Evoke's joinder to Wright's motion for summary judgment (ECF No. 320) is granted.

[2] This motion is fully briefed. *See* Resp., ECF No. 321 (sealed) and ECF No. 323; Reply, ECF No. 333 (sealed) and ECF No. 332. Wright previously moved to seal portions of its summary judgment motion and its reply. *See* ECF No. 318; ECF No. 340. An unredacted version of Wright's summary judgment motion is filed at ECF No. 318-1. Wright now seeks to seal portions of its motion, exhibit C, its reply, and exhibit 1 attached to Bartow's declaration. ECF No. 341.

[3] This motion is fully briefed. *See* Resp., ECF No. 329; Reply; ECF No. 336. Unless otherwise specified, because Evoke filed both sealed (ECF No. 316) and unsealed (ECF No. 314) versions of its motion, I will refer to the sealed version when referring to the motion.

System to process and handle Wright insurance claims. *Id.* at ¶ 24. To use the ImageKeeper System, Wright agreed to strict use-restrictions and confidentiality requirements imposed by ImageKeeper. *Id.* In 2019, ImageKeeper requested that Wright pay multiple outstanding invoices and rather than pay, Wright requested a negotiation of new prices and terms for a service agreement to resolve said invoices. *Id.* at ¶ 27. The parties subsequently renegotiated a new relationship, including a subsequent Software Agreement (SSA) which included a two year non-compete and other restrictions on competition. *Id.* at ¶¶ 28–39.

ImageKeeper alleges that, on October 15, 2019, ten days before the parties executed the SSA, Wright created unauthorized user accounts on the ImageKeeper System to provide access to Evoke—a global information technology services company that offers software development, IT outsourcing and IT consulting services—and subsequently hired Evoke on October 24, 2019 to help implement Wright's new mobile application. *Id.* at ¶¶ 43–44. In 2020, ImageKeeper discovered Wright's application in the Apple Store which allegedly looked and functioned similarly to ImageKeeper's Adjuster Application. *Id.* at ¶ 47. Upon further investigation, ImageKeeper discovered the unauthorized accounts created on October 15 and uncovered that the unique administrator login credentials ImageKeeper had registered only to Tim Love, Wright's Chief Information Officer, had been provided to one or more software developers at Evoke. *Id.* at ¶¶ 48–49. Further data revealed that individuals from Wright and Evoke had reviewed proprietary ImageKeeper designs and data and tested multiple different proprietary functions in the ImageKeeper system, including from IP addresses originating in India, where Evoke has operations. *Id.* at ¶ 51. ImageKeeper alleges that Wright never had any intention of honoring its contractual and confidentiality obligations with ImageKeeper and only signed the SSA to ensure continued access to the system while hiring Evoke to "misappropriate, copy, reverse engineer the ImageKeeper System to create a competing clone product." *Id.* at ¶¶ 56–57.

Prior to the pending motion, defendants moved for partial summary judgment on the issue of whether the alleged trade secrets were sufficiently particular to survive summary

judgment. ECF No. 218; ECF No. 227. I granted this motion in part, finding that only alleged Trade Secrets 3 ("Proprietary, non-public APIs accessible only through the ImageKeeper Portal (e.g., insurance claim updates and associated claim update API).") and 6 ("Proprietary Formula for Loss Reserve Estimator") were sufficiently particular to survive summary judgment for purposes of Counts 1, 2, and 3. Order, ECF No. 301 at 8–9. Wright and Evoke then filed the present summary judgment motions, seeking summary judgment on all twelve of ImageKeeper's claims against them.

## II.    Legal standard

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Id.* at 250–51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24.

The moving party—the one seeking summary judgment—bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. If the moving party fails to

meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970). However, if the moving party satisfies Rule 56's requirements, then the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. At summary judgment, "a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial." *Assurance Co. of Am. v. Ironshore Specialty Ins. Co.*, 2015 WL 4579983, at *3 (D. Nev. July 29, 2015) (citing *Anderson*, 477 U.S. at 249). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

**III.    Discussion**

In Wright's motion, joined by Evoke, the twelve counts are categorized by content rather than in numerical order. *See* ECF No. 318-1 at 9. Because the response and reply follow this same structure, I follow suit in this order. Counts 1, 2, 3, 8, 9, and 11 are purely grounded in tort, with the first three counts in particular based on trade secrets. *Id.* Counts 5, 6, and 7 are based on computer access laws. *Id.* Counts 4 and 12 are grounded in contract. *Id.* Count 10—breach of the implied covenant of good faith and fair dealing, levied only against Wright—is grounded in both tort and contract. *Id.*

**A.  Trade secret tort claims under DTSA and NUTSA (Counts 1 and 2)[4]**

In my prior summary judgment order, I found that ImageKeeper stated with sufficient particularity the existence of two trade secrets in its amended complaint[5] (AC). ECF No. 301 at 8–9. These were alleged Trade Secrets 3 ("Proprietary, non-public APIs accessible only through the ImageKeeper Portal (e.g., insurance claim updates and associated claim update API).") and 6 ("Proprietary Formula for Loss Reserve Estimator"). *Id.*

---

[4] I address Count 3, infringement of trade secrets, infra in the section discussing preemption.
[5] Am. compl., ECF No. 67; ECF No. 68 (sealed).

### 1. Misappropriation under DTSA and NUTSA

Courts have analyzed federal DTSA and state UTSA claims together, including favorably comparing DTSA and NUTSA. *See Elko, Inc. v. WTH Com. Servs., LLC*, 2023 WL 6141623, at *2 (D. Nev. Sept. 20, 2023) (citing *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (finding that the elements of federal and state law trade secret claims are "substantially similar")). Accordingly, I do the same here.

To prevail on a trade secret misappropriation claim under the DTSA, a plaintiff must demonstrate "(1) that [they] possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC*, 978 F.3d at 657-58 (citing 18 U.S.C. § 1839(5)). To prevail on a trade secret misappropriation claim under NUTSA, a plaintiff must show: "(1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose." *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000) (internal citations omitted). Both statutes thus similarly require that a plaintiff show: (1) that a protectable trade secret exists; and (2) misappropriation of that trade secret. Following my previous summary judgment ruling, the parties do not appear to contest that there is a genuine dispute of material fact as to whether alleged Trade Secrets 3 and 6 exist. Thus, I only evaluate whether there has been misappropriation.

Under the DTSA, misappropriation is defined as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> > (i) used improper means to acquire knowledge of the trade secret;
> >
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I)　　derived from or through a person who had used improper means to acquire the trade secret;

(II)　　acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III)　　derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii)　　before a material change of the position of the person, knew or had reason to know that—

(I)　　the trade secret was a trade secret; and

(II)　　knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).

Misappropriation under NUTSA is defined as:

(a) Acquisition of the trade secret of another by a person by improper means;

(b) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(c) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(1)　Used improper means to acquire knowledge of the trade secret;

(2)　At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(I)　　Derived from or through a person who had used improper means to acquire it;

(II)　　Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III)　　Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(3) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Nev. Rev. Stat. § 600A.030(2).

### a. Alleged Trade Secret 6: Loss Reserve Calculator

In the earlier summary judgment order, I held:

Alleged Trade Secret 6 is identified as the "Proprietary Formula for Loss Reserve Estimator" and, after a brief description of its functionality, ImageKeeper produces the source code comprising the formula. ECF No. 217-3 at 28. This is a clear, concrete contour to describe the trade secret ImageKeeper alleges was stolen by defendants. *See SocialApps, LLC v. Zynga, Inc.*, 2012 U.S. Dist. LEXIS 82767, at *11–14 (N.D. Cal. June 14, 2012) ("[I]dentifying specific lines of code . . . [is] sufficiently detailed to identify what it is that [plaintiff] claims is secret."). While Wright argues that "[t]he Final ID, Plaintiff's corporate witness testimony, and the Opposition all conflict with each other regarding the scope of Alleged Trade Secret 6" (ECF No. 241 at 24), any such evidentiary conflict is properly the providence of the jury to resolve now. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992) ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment.' Where material factual disputes exist, the court must allow a jury to resolve them."). Because ImageKeeper has provided sufficient particularity such that a reasonable jury is able to determine the contours of its Alleged Trade Secret 6, summary judgment on particularity is inappropriate.

ECF No. 301 at 8.

Defendants argue that the extent of alleged Trade Secret 6 is the "proprietary formula" set out in its source code. ECF No. 318-1 at 19. They cite to the testimony of ImageKeeper's Fed. R. Civ. P. 30(b)(6) witness, who acknowledged that "the idea[ ]"[6] is that "[t]he idea of having a loss reserve estimator in and of itself is not an ImageKeeper alleged trade secret[.]" ECF No. 318-2 at 8. Instead, it is the "implementation of that formula" that is "set forth in th[e] snippet of

---

[6] The transcript states that the Rule 30(b)(6) witness responded "[t]he ideal, yes[,]" in response to a question asking about the idea. ECF No. 318-2 at 8. Defendants acknowledge this with a "[sic]" in their motion. ECF No. 318-1 at 19. Because ImageKeeper does not appear to contest this interpretation, I will assume "ideal" was a mere scrivener's error, and the transcript should say "[t]he idea, yes."

source code on page 27 and 28 that is the proprietary allegedly proprietary formula that ImageKeeper is alleging as Trade Secret 6." *Id.* at 9. Defendants argue that the source code sets out a formula with a series of variable multipliers and point to the same deposition testimony for examples. ECF No. 318-1 at 19–20 (citing *id.*). They argue that "it is the specific formula reflected in the source code that comprises Alleged Trade Secret 6—not the 'idea' of having a 'loss reserve estimator' or some other broader, more abstract concept." *Id.* at 20. If the source code is not the trade secret, defendants contend, then the trade secret lacks the "concrete contours" I described in the prior summary judgment order. *Id.* Defendants argue, therefore, that if they lacked access to this formula, they could not misappropriate it. *Id.* It is undisputed that Wright or Evoke never had access to the formulas. ECF No. 318-2 at 9–10 ("Q. By the way, does ImageKeeper contend that this particular source code here set forth on pages 27 and 28 was accessed? A. No.").

In response, ImageKeeper argues that alleged Trade Secret 6 "is not limited to the exemplar source code for the Loss Reserve Estimator. Trade Secret 6 expressly encompasses the configuration and process flow offered and accessed by Evoke on the ImageKeeper System." ECF No. 321 at 17. ImageKeeper cites its previous disclosures stating that "[t]he Loss Reserve Calculator can be enabled and configured by an ImageKeeper member with restrictive domain administrative privileges. ImageKeeper ensures the 'Management' menu option is only accessible to members with restrictive domain administrative privileges." ImageKeeper's fourth supp. resps. to interrogs., ECF No. 271-2 at 11. It insists that, based on its technical summary (ECF No. 235-3), the "source code provided by ImageKeeper merely described the tool in a concise manner; the code was not the trade secret itself." ECF No. 321 at 18 (citing ImageKeeper 30(b)(6) dep., ECF No. 321-1 at 4 ("The code on this page implements the actual formula that is the code that performs the actual formula that calculates the loss reserves, but it's -- that's the sole piece of that which is just a piece of Trade Secret 6."). ImageKeeper argues that Wright Flood maintained access to the "management" menu through its login credentials, and by sharing those with Evoke, it gave Evoke "access to the Loss Reserve

Calculator otherwise accessible only to users with restrictive domain administrative privileges. Evoke used the proprietary information in the ImageKeeper System and exercised those values to develop the Wright Flood application." *Id.* (citing Love dep., ECF No. 321-5 at 26 and Reisinger dep., ECF No. 321-8 at 3, 4).

I find that, in the light most favorable to ImageKeeper, there is a dispute of material fact as to whether the defendants misappropriated alleged Trade Secret 6 under DTSA or NUTSA. ImageKeeper argues that its "Trade Secret No. 6 Technical Summary" sufficiently sets out the scope of alleged Trade Secret 6, including the "system architecture, required access levels, and components associated with these functions." ECF No. 237 at 21. In its technical summary, ImageKeeper distinguishes the menu options in its Loss Reserve Calculator for a standard user and an "elevated user." ECF No. 235-3 at 2–3. For basic users, the "building loss reserve" option is a "non-editable field while the contents field can still be adjusted as necessary." *Id.* at 3. For elevated users, there are additional options for "configuration" that allow a user to "enable loss reserve calculator" and input values for "Quality of Home Const" that "reflect the Cost per SQFT based on the defined quantity" and "HVAC Replacement Cost" that represent the "average cost to replace the HVAC in the case of a partial loss or a complete loss." *Id.* at 2. ImageKeeper acknowledges that the idea of the loss reserve estimator is not what it considers a trade secret. ECF No. ECF No. 318-1 at 20. So, from its "technical summary" and its briefing, ImageKeeper argues that it is not only the source code for the formula that encompasses Trade Secret 6, but also the "configuration" menu and/or the ability to make additional inputs.

To prove ownership of a trade secret, a plaintiff "must identify the trade secrets and carry the burden of showing they exist." *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). "The plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade.'" *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998). A plaintiff must "*clearly refer* to tangible trade secret material" instead of referring

to a "system which *potentially* qualifies for trade secret protection." *Id.* at 1167 (emphasis in original). Further, "[p]laintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial." *InteliClear, LLC*, 978 F.3d at 658.

Defendants argue that ImageKeeper's conception of alleged Trade Secret 6 is not sufficiently detailed, but for purposes of summary judgment, I disagree. In *InteliClear*, the plaintiff introduced several declarations and outlined "specific tables, table columns, account identifiers, codes, and methodologies InteliClear claimed as trade secrets." *Id.* at 658-59. It distinguished this from "using 'catchall' phrases or merely identifying categories of information," and found that "[a] reasonable jury could conclude that the uniquely designed tables, columns, account number structures, methods of populating table data, and combination or interrelation thereof, are protectable trade secrets." *Id.* at 659. Here, ImageKeeper has outlined its alleged Trade Secret 6 as the source code and also the unique system of variables allowing a user of its app to manually adjust certain variables—a system only available to those who have received private login access. Although ImageKeeper acknowledges that the defendants did not have access to the source code, Wright was given access to the private passcode-protected app menu that gave its users options for additional value inputs not available to the public. *See* ECF No. 235-3 at 2–3. The source code describes the formula specifically, but the menu sets out the variables of the formula, which was proprietary and for which ImageKeeper maintained reasonable measures to keep secret.[7] I find that ImageKeeper, for purposes of summary judgment, has sufficiently described its alleged Trade Secret 6 with concrete contours.

Evoke, in its own motion for summary judgment, argues that it nonetheless is entitled to summary judgment regarding the misappropriation of alleged Trade Secret 6 because "improper means," as defined in 18 U.S.C. §§ 1839(5)(A) and (B) does "'not include reverse engineering, independent derivation' or other 'lawful means of acquisition.'" ECF No. 316 at 8 (quoting 18

---

[7] *InteliClear, LLC*, 978 F.3d at 660 ("Under the DTSA, a required element of a trade secret is that the owner 'has taken reasonable measures to keep such information secret.'" (quoting 18 U.S.C. § 1839(3))).

U.S.C. § 1839(6)(B)). It argues that because ImageKeeper "has produced no evidence that Evoke had access to, let alone accessed, ImageKeeper's source code to create the Wright Flood app" and "did not even create a loss reserve estimator on the app it developed[,]" it did not misappropriate alleged Trade Secret 6. *Id.* at 9. Additionally, it argues that because "Wright Flood was a paying user of the ImageKeeper System and gave Evoke access to it . . . Evoke did not know or have reason to know that its access was improper." *Id.* (citing 18 U.S.C. § 1839(5)(A) (requiring that acquisition of trade secret is by someone "who knows or has reason to know that the trade secret was acquired by improper means") and Nev. Rev. Stat. §§ 600A.030(2)(a)–(b) (similar)).

In response, ImageKeeper contends that the reverse engineering that Evoke allegedly conducted was improper because its access to alleged Trade Secret 6 was not authorized. ECF No. 325 at 22. It also argues that Evoke's access was improper based on Wright's alleged violation of the SSA and Evoke knew its access was improper because it was told: "When you are posting any requests to [ImageKeeper] test system, make sure you are doing from US region EC2 instance. [ImageKeeper] should not be aware that someone from India is accessing their system." Evoke internal email, Pl.'s Ex. 7, ECF No. 271-4 at 18.

At the summary judgment stage, I find there remains a genuine dispute of material fact as to whether Evoke misappropriated alleged Trade Secret 6. As discussed later in this order, I also find that summary judgment is not warranted as to ImageKeeper's breach of contract claim, leaving open the possibility that Evoke's access to alleged Trade Secret 6 was improper. Additionally, the email evidence sufficiently supports ImageKeeper's contention that Evoke knew that its access to the Trade Secret material was improper to raise a genuine dispute of material fact. Therefore, I deny both motions for summary judgment as to alleged Trade Secret 6, and ImageKeeper may maintain Claims 1 and 2.

### b. *Alleged Trade Secret 3: API documentation*

In the earlier summary judgment order, I held:

> Alleged Trade Secret 3 is described as "Proprietary, non-public APIs accessible only through the ImageKeeper Portal (e.g., insurance claim updates and associated claim update API)." ECF No. 217-3 at 22. In its summary judgment response, ImageKeeper specifically identifies that Alleged Trade Secret 3 is the "the API documentation itself" and lists the comprising documentation: defining the endpoints available to adjusting firm APIs, the endpoints to request access tokens used to communicate with the ImageKeeper System, and APIs defining endpoints available for insurance carriers, among other exemplary and technical documentation. ECF No. 237 at 15–16. Wright argues that ImageKeeper's statement that Alleged Trade Secret 3 is the "the API documentation itself" is inconsistent with the Final ID as well as with ImageKeeper's corporate testimony. ECF No. 241 at 19. This is similarly an issue for the jury to resolve now: ImageKeeper has presented sufficient particularity for a jury to reasonably understand what the contours of Alleged Trade Secret 3 are and thus summary judgment here is inappropriate.

ECF No. 301 at 8–9. As the Supreme Court explained, API is "a tool that 'allow[s] programmers to use . . . prewritten code to build certain functions into their own programs, rather than write their own code to perform those functions from scratch.'" *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 9 (2021) (quoting *Oracle America, Inc. v. Google, Inc.*, 750 F.3d 1339, 1349 (Fed. Cir. 2014)). "Through an API, a programmer can draw upon a vast library of prewritten code to carry out complex tasks." *Id.*

In their motion, the defendants argue first that ImageKeeper cannot prove that the twenty-seven documents that comprise alleged Trade Secret 3 have independent economic value. *Id.* at 22. Specifically, under both DTSA and NUTSA, the plaintiff bears the burden of proving that the alleged trade secret has "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means." *Id.* (quoting 18 U.S.C. § 1839(3)(B) and citing Nev. Rev. Stat. § 600A.030(5)(a)(1)). They cite to *Google LLC v. Oracle Am., Inc.*, in which the U.S. Supreme Court held that the plaintiff's copying of thousands of lines of code from several dozens of the defendant's API declarations was a "fair use." ECF No. 318-1 at 22–23 (citing 593 U.S. at 8–13). Defendants argue that the API

"documents broadly contain public or generic information that any homeowner making a flood claim might share, or FEMA-requested information." *Id.* at 24. They point specifically to several of ImageKeeper's API documents that describe a basic two-factor authentication system, as well as "the API to retrieve an existing flood claim," for which the "input (request) is a 'Carrier Claim Number' (i.e., the claim number assigned by an insurance carrier); the corresponding output (response) consists of the claim number, two additional numbers (based on FEMA process), and a 'success' or 'error' message." *Id.* (citing ECF No. 237). These, defendants argue, clearly demonstrate that the API documentation describes basic functions that do not retain independent economic value.

In response, ImageKeeper argues that "APIs and their corresponding documentation constitute a protectable trade secret if sufficient measures are taken to maintain confidentiality." ECF No. 321 at 19 (citing *Khoros, LLC v. Lenovo (United States), Inc.*, 2020 WL 12655516, at *7 (N.D. Cal. Oct 5, 2020) (holding that, at the motion to dismiss stage, APIs may be trade secrets where they are only accessible to customers who were under confidentiality obligations)). It asserts that because "the underlying API can constitute a trade secret . . . the corresponding technical and engineering documentation is likewise protectable." *Id.* (citing 18 U.S.C. § 1839(3) and Nev. Rev. Stat. § 600A.30(5)). It argues that the API documentation "defined, for example, the endpoints available for adjusting firms, including documentation for retrieving a listing of all adjusters," and "sets forth confidential information such as the response codes, the names and descriptions of the parameters necessary to make the API calls, sample request formats, response information, and sample response formats." *Id.* at 20 (citing API docs., ECF No. 271-5).

In their reply, defendants argue that ImageKeeper engages in misdirection, focusing on the fact that it took "sufficient measures to maintain confidentiality" without actually engaging with whether its APIs and the corresponding documents have independent economic value. ECF No. 333 at 12–13. In effect, that measures were taken to maintain confidentiality is necessary, but not sufficient, to make something a protectable trade secret under DTSA and

NUTSA. *Id.* (citing *Hanks v. Anderson*, 2024 WL 4092949, at *9 (D. Utah Sept. 5, 2024) ("Because such elements as independent economic value are inherent to the definition of a trade secret, it necessarily follows that such showing must be made per trade secret.") (internal citation omitted), and *Fortunet, Inc. v. Coronel*, 2024 WL 3841864, at *5 (D. Nev. Aug. 14, 2024) ("We also agree that [plaintiff] failed to demonstrate that its putative trade secret had independent economic value . . . . We have no doubt that the BingoStar System is a highly valuable *product* for the company. But [plaintiff] does not explain the extent to which BingoStar's value is independently attributable to its [alleged trade secret].") (emphasis in original)). They further assert that they specifically requested in Interrogatory No. 6: "[f]or each [alleged trade secret], describe in detail the bases for any contention that the [alleged trade secret] derives value from not being known to the public or in the relevant field." ECF No. 333 at 14 (quoting First supp. resps. to interrog. No. 6, ECF No. 163-1 at 40–41). In response, ImageKeeper stated the following:

> Plaintiff objects to this interrogatory as vague and ambiguous, overbroad, and unduly burdensome. Without waiving the foregoing objections and subject thereto, Plaintiff responds as follows for each of the Trade Secrets identified responsive to Interrogatory No. 1: ImageKeeper has spent millions of dollars and tens of thousands of human hours on conception, research, development, testing, and executing in order to develop and implement the proprietary technology and Trade Secrets present in the ImageKeeper System.
>
> All of the identified Trade Secret [sic] derive value by providing ImageKeeper an advantage over competitors. Wright Flood has recognized the inherent value of these Trade Secrets by illicitly accessing and replicating in a clone claim processing system and application for servicing flood insurance claims. Wright Flood's use of the Trade Secrets (as a result of Evoke's ongoing misappropriation that was facilitated by Wright Flood) has now expanded well beyond flood insurance claims as a result of Evoke having expanded its misuse of the same.
>
> If the Trade Secret were otherwise known to the public or in the relevant field, Wright Flood should have been able to independently develop the same without access to or utilizing (illicitly or otherwise) any portion of the ImageKeeper System. Wright Flood instead illicitly and covertly accessed the system and engaged the expertise of a third-party—Evoke—to assist in its illicit access to, misappropriation of, copying and eventual implementation of a cloned system having features and functionalities related to this Trade Secret. Such activity involved multiple unauthorized access events that took place over the course of

many months. Wright Flood and its agent Evoke's own behavior therefore serves
as a basis for ImageKeeper's contention that the Trade Secret is not readily known
to the public or the relevant field.

ECF No. 163-1 at 41–42. Defendants note that, in its opposition, ImageKeeper's table lists only

sixteen API documents (down from the twenty-seven it initially asserted), and at no point has it

attempted to assert the value of these documents or the APIs individually or together. ECF No.

333 at 14 (citing *Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 770 (4th Cir. 2023) ("[Plaintiff]

had cut the number of alleged trade secrets by almost half, yet it had not adjusted its asserted

value for the remaining trade secrets.").

Viewing the facts in the light most favorable to ImageKeeper, there is no way to conclude

that these APIs and the associated documents are independently valuable because ImageKeeper

has not provided any documentation to that effect. That it kept them safeguarded is material,

but that alone does not end the inquiry. As noted in *Google LLC v. Oracle Am., Inc.*, "as part of a user

interface, the [API declaration] differs to some degree from the mine run of computer programs. .

. . [U]nlike many other programs, its use is inherently bound together with uncopyrightable

ideas (general task division and organization) and new creative expression (Android's

implementing code)." 593 U.S. at 28. Although ImageKeeper is correct in pointing out that there

are major distinctions between what can be considered a "copyrightable idea" and what can be

considered a trade secret, the thrust of the Supreme Court's analysis is based on the fact that

declaring code for APIs do not house the same sort of secret information as "most computer

programs (such as the implementing code) . . . ." *Id.* at 29. ImageKeeper has gone to great lengths

to argue that its APIs were trade secrets because they were behind barriers, but when given

repeated opportunities to actually explain their value, it either refuses to or simply cannot do so.

Instead, it has presented the independent value (of all of its trade secrets, I note) as obvious: the

APIs must have had independent value because, if not, "Wright Flood should have been able to

independently develop the same without access to or utilizing (illicitly or otherwise) any

portion of the ImageKeeper System." ECF No. 163-1 at 41. I find that ImageKeeper's one-size-fits-

all approach to assessing independent value, as it chose to use in its response to Interrogatory No. 6, does not sufficiently explain the value of the APIs and corresponding documentation beyond the fact that it kept them under lock and key. The independent values of the Coca-Cola formula or the Kentucky Fried Chicken seasoning blend, for example, do not derive merely from the fact that they are kept secret, just as a chef placing a printed free online recipe into their safe does make it their trade secret. Having failed to raise a genuine dispute of material fact as to its independent value, I find that ImageKeeper cannot pursue its DTSA and NUTSA claims as to alleged Trade Secret 3.[8]

### 2. *Damages as to alleged Trade Secret 6*

Evoke, in its separate motion, also argues that ImageKeeper has not produced evidence of damages resulting from Evoke's alleged misappropriation. ECF No. 316 at 10. ImageKeeper must show either (and may show both) (1) "damages for actual loss caused by the misappropriation of the trade secret; and/or (2) "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss . . . ." 18 U.S.C. § 1836; *see also* Nev. Rev. Stat. § 600A.050(1) ("Damages include both loss caused by misappropriation and unjust enrichment caused by misappropriation that is not taken into account in computing the loss."). Evoke argues that ImageKeeper has not proffered evidence that it suffered losses as a result of Evoke's actions, which is relevant because ImageKeeper does not seek avoided development costs from Evoke (although it does from Wright), but only profits Evoke made from the alleged misappropriation. ECF No. 316 at 10. Evoke argues that it did not profit from any alleged misappropriation because Evoke did not "convert[ ] any data to its own use, s[ell] any data to third parties, s[ell] the app to third parties, use[ ] the app itself, or s[ell] or transfer[] the API Documentation to third parties." *Id.* at 11. It also argues that ImageKeeper's proffered damages expert does "not calculate alleged unjust enrichment 'caused by the

---

[8] Because I dismiss ImageKeeper's DTSA and NUTSA alleged Trade Secret 3 claims for want of independent value against both defendants, I address neither the misappropriation arguments nor Evoke's separate motion's arguments as to this issue.

misappropriation' at all" and improperly opines "that his client is entitled to all the money Evoke received from Wright Flood for IT services rendered—$295,619—minus expenses. . . . This amount does not represent unjust enrichment from alleged trade secret misappropriation but just compensation Evoke earned under its services contract with Wright Flood for developing an app and other IT services." *Id.*

In response, ImageKeeper argues that "Evoke used the proprietary trade secrets and information gathered from the ImageKeeper System to build the Wright Flood Application." ECF No. 325 at 23. Among other arguments related to its proffered expert's testimony, ImageKeeper asserts that the reason its expert could not conduct an attribution analysis was because Evoke did not provide its deductible costs and, Evoke failed to provide legal support for its assertion that the cost of the entire service rendered, if based on misappropriated trade secrets, could serve as the calculated value of the unjust enrichment. *Id.* at 25. ImageKeeper also asserts that Evoke's argument is procedurally improper because it effectively seeks a *Daubert* analysis of ImageKeeper's expert without having filed a *Daubert* motion. *Id.* at 24 (citing *Est. of Taschek v. Fid. Life Ass'n*, 2024 WL 3498290, at *8 (D. Nev. July 18, 2024) (finding arguments concerning expert exclusion at summary judgment "should [be] made in a separately filed *Daubert* motion")).

In its reply, Evoke contends that its arguments regarding ImageKeeper's proffered expert are not procedurally improper. ECF No. 336 at 9. It cites *Tesla, Inc. v. Tripp*, in which a court in this district specifically rejected ImageKeeper's argument that a separate *Daubert* motion is required where a motion for summary judgment challenges an expert's decision-making in his methodology. 487 F. Supp. 3d 953, 963 (D. Nev. 2020) ("Tripp does not, as would be typical in a *Daubert* motion, challenge Kinrich's qualifications, and only challenges Kinrich's methodology to the extent Tripp argues Kinrich should have conducted an event study. The Court understands Tripp's argument as operating at a higher conceptual level than a *Daubert* challenge, in gist arguing that no matter how qualified Kinrich is, or how spot-on his methodology, Tripp's

actions cannot have caused Tesla approximately $167 million in damages. So construed, the Court agrees.").

Here, I find there remains a genuine dispute of material fact as to the unjust enrichment damages. Specifically, there is a genuine dispute as to whether Evoke profited from the alleged misappropriation of alleged Trade Secret 6. Although Evoke may not have turned around and sold the information it allegedly misappropriated, Evoke's Rule 30(b)(6) witness acknowledged—at least read in the light most favorable to ImageKeeper—that Evoke did rely on, at least in part, ImageKeeper's Loss Reserve Estimator in creating its own app for Wright, and was paid by Wright to do so. Alla dep., ECF No. 325-1 at 4 (The Wright Flood app had "a reserve value, damage value fields where there was some logic which Wright Flood wanted to do."); ECF No. 316 at 2 ("Evoke received a base fee of $142,000 for creating the app . . . ."). Thus, ImageKeeper has proffered sufficient factual support to create a genuine dispute of material fact as to whether Evoke was paid by Wright for its development of an app that included this reserve value field, which it allegedly misappropriated from ImageKeeper.

Further, although these issues *could* be raised in a *Daubert* hearing, I agree with the reasoning in *Tripp* that, when a summary judgment motion only challenges the proposed expert's decisions as to which studies or analyses to conduct (or not to conduct), it is procedurally proper to consider this argument in resolving the motion. However, Evoke's argument is distinguishable from *Tripp*. Here, the argument that the expert's analysis should be dismissed fails because the flaws in Evoke's expert's methodology are the result of Evoke's own actions, or rather inactions. As ImageKeeper points out, Evoke did not provide the information required for even Evoke's own rebuttal expert to analyze its profits. Beaton report, ECF No. 327-4 at 4 ("At this time, I have not been provided with Evoke's income statement to address the contribution margin associated with the revenue generated by Evoke. As such, I have not been able to analyze Evoke's profits, if any, that would be attributable to the alleged wrongful acts of Evoke."). Thus, I find that, even if Evoke's position that challenging the expert is procedurally improper is

correct, ImageKeeper's expert's analysis raises a genuine dispute of material fact as to the attribution of Evoke's profits that resulted from the alleged misappropriation. To the extent that Evoke seeks to challenge the expert's analysis and conclusions—as opposed to decisions regarding what analysis was required based on the information before him (*see Tripp*)—it is limited to doing so in a *Daubert* motion. Therefore, Evoke's motion for summary judgment as to the damages from the alleged misappropriation of alleged Trade Secret 6 is denied.

### 3. *Preemption under NUTSA (Counts 3, 7, 9, and 11)*

NUTSA "prohibits the misappropriation of trade secrets and provides for a private right of action for damages and injunctive relief." *See* Nev. Rev. Stat. § 600A.010 *et seq.* Nev. Rev. Stat. § 600A.090. A specific provision in the NUTSA, displaces conflicting tort, restitutionary, and other laws permitting civil remedies for misappropriation of a trade secret. *See* Nev. Rev. Stat. § 600A.090. Common law claims that arise out of the same factual episode as the misappropriation of a trade secret claim are typically precluded under NUTSA. *Frantz*, 999 P.2d at 357–58. District Judge Gloria M. Navarro[9] determined that, at the motion to dismiss stage, it was not improper for ImageKeeper to raise these claims because, under Federal Rule of Civil Procedure 8(b), it "may plead statutory and non-statutory claims in the alternative, even if non-statutory claims are duplicative of the misappropriation of trade secrets claim." ECF No. 170 at 7–9.

Defendants assert that the statutory claims in Counts 3, 7, 9, and 11 are duplicative and therefore barred by NUTSA. ECF No. 318-1 at 26; *see also* ECF No. 316 at 12–14 (arguing that Counts 3, 7, and 9 are preempted by NUTSA; Evoke does not address Count 11, which is only levied against Wright, in its motion). In support of their argument, the defendants cite *Menalco v. Buchan*, where the court stated that for a claim to be "based upon" trade secret misappropriation, it must have arisen from the same, "single factual episode" as the plaintiff's trade secret claims. 2010 WL 428911, at *22 (D. Nev. Feb. 1, 2010). In response, ImageKeeper asserts that the claims

---

[9] This case was administratively reassigned to me on April 13, 2022. ECF No. 215.

this court previously found do not constitute trade secrets (specifically alleged Trade Secrets 1, 2, 4, 5, and 7) are nonetheless "confidential and proprietary" and the fact that they are no longer considered trade secrets prevents there from being any preemption. ECF No. 321 at 26. Essentially, ImageKeeper asserts that the claimed proprietary information contained in its alleged Trade Secrets 1, 2, 4, 5, and 7 no longer implicates Count 2 and can thus be considered separately for purposes of Counts 3, 7, 9, and 11. *Id.* In reply, the defendants insist that ImageKeeper is effectively asking for a "do-over," having lost its argument that alleged Trade Secrets 1, 2, 4, 5, and 7 were trade secrets and now hoping to have them relitigated under several other statutes. ECF No. 333 at 16–20.[10]

### a. *Count 3: Infringement of trade secrets under NRS 603.080, 603.050*

In addition to their arguments above regarding Count 3, Defendants argue that ImageKeeper sets out the same basis for its infringement claims as it does its NUTSA claim in the AC. ECF No. 318-1 at 27. ImageKeeper responds that Nev. Rev. Stat. § 603.050 contains an additional "copying" element that NUTSA misappropriation lacks. ECF No. 321 at 26. Specifically, "[i]t is an infringement of a trade secret for a person . . . to obtain possession of or access to a proprietary program or a compilation of proprietary information . . . and **make or cause to be made a copy of that program or data** . . . ." Nev. Rev. Stat. § 603.050 (emphasis added). ImageKeeper asserts that the additional element makes NUTSA preemption improper. ECF No. 321 at 27. In their reply, defendants assert that "'copying' is not an 'additional element' beyond misappropriation. It is just one particular species of misappropriation." ECF No. 333 at 20 (citing Nev. Rev. Stat. § 600A.300 (defining "misappropriation" to include "acquisition")).

---

[10] Because Evoke's motion for summary judgment's arguments as to Counts 3, 7, and 9 are substantially similar, ECF No. 316 at 12–14, I cite only to defendants' combined summary judgment motion, ECF No. 318-1 at 26–29. The ultimate ruling as to each count applies to both defendants' motions.

Nev. Rev. Stat. § 603.050 states:

> It is an infringement of a trade secret for a person, without the consent of the owner, to obtain possession of or access to a proprietary program or a compilation of proprietary information that is stored as data in a computer and make or cause to be made a copy of that program or data if the program or data:
>
> 1. Is used in the owner's business;
>
> 2. Gives the owner an opportunity to obtain an advantage over competitors who do not know or use it;
>
> 3. Is treated by the owner as secret; and
>
> 4. Is not copyrighted because an application therefor would result in the program or data no longer being secret.

There is ongoing debate about whether NUTSA preempts laws like § 603.050 where, instead of explicitly discussing "Trade Secrets," the plaintiff seeks recovery for invasions of their proprietary information more generally. In *Newmark*, a court in this district considered this very question. *Newmark Grp., Inc. v. Avison Young (Canada) Inc.*, 2019 WL 575476, at *7 (D. Nev. Jan. 7, 2019), *report and recommendation adopted sub nom. BGC Partners, Inc. v. Avison Young (Canada), Inc.*, 2019 WL 570724 (D. Nev. Feb. 11, 2019) ("Plaintiffs, however, also seek to allege noncontractual claims for misappropriation of confidential information that does not qualify as a trade secret."). As that court explained: "The Nevada Supreme Court has not clearly stated whether NRS 600A.090.1 preempts a noncontractual claim for misappropriation of confidential information that does not constitute a trade secret. Courts in other jurisdictions are divided on this issue." *Id.* The *Newmark* court then took pains to describe the two competing views. On one hand, the Arizona Supreme Court held that the Arizona UTSA's "preemption provision, on its face, displaced only conflicting claims for misappropriation of a trade secret." *Id.* at *8 (citing *Orca Commc'ns Unlimited, LLC v. Noder*, 337 P.3d 545, 547 (Ariz. 2014)). The Arizona Supreme Court explained that if the legislature intends to preempt a cause of action, the law's text or the legislative history should say so explicitly, and a statute should not be interpreted in favor of

preemption if there is reasonable doubt about the legislature's intent. *Orca Commc'ns*, 337 P.3d at 547.

In contrast, the Hawaii Supreme Court, espousing the "majority view," held that the Hawaii UTSA's preemption provision "'abolish[es] all free-standing alternative causes of action for theft or misuse of confidential, proprietary, or otherwise secret information falling short of trade secret status (e.g. idea misappropriation, information piracy, theft of commercial information, etc.).'" *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 235 P.3d 310, 321 (Haw. 2010) (quoting *Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 655 (E.D. Tenn. 2004)). The Hawaii Supreme Court explained the rationale behind this view as follows:

> States adopting statutory provisions analogous to the UTSA's section 7 intend that at least some prior law relating to the protection of commercial information be displaced. Permitting litigants in UTSA states to assert common-law claims for the misappropriation or misuse of confidential data would reduce the UTSA to just another basis for recovery and leave prior law effectively untouched. Further, by expressly exempting "contractual remedies, whether or not based upon misappropriation of a trade secret" and "other civil remedies that are not based upon misappropriation of a trade secret" from its preemptive penumbra, the UTSA makes clear that only those claims addressing or arising out of wrongs distinct from pure information piracy survive passage of the trade secret statute. Indeed, contrary interpretations of the UTSA's "Effect on Other Law" provision . . . effectively negate the UTSA's goal of promoting uniformity in "trade secrets" law. Additionally, these contrary interpretations render the statutory preemption provision effectively meaningless.

*Id.* at 321–22 (quoting Unikel, Bridging the "Trade Secret" Gap, 29 Loy. U. Chi. L.J. at 887–88).

The *Newmark* court looked to *Frantz*, in which the Supreme Court of Nevada stated that "we do not agree that the UTSA provides a **blanket preemption** to all claims that arise from a factual circumstance possibly involving a trade secret." *Newmark Grp.*, 2019 WL 575476, at *10 (quoting *Frantz*, 999 P.2d at 357 n.3) (emphasis added). It ultimately concluded:

> While the foregoing dictum provides some support for the "plain language" interpretation, it is not determinative. In particular, the court did not analyze and weigh the conflicting interpretations of the preemption provision. Another factor potentially supporting the plain language interpretation, however, is the Nevada Legislature's repeal of the uniformity provision, NRS 600A.020, in 1999. The

> majority approach may well be the better rule in light of the purposes of the Uniform Trade Secrets Act. Given the clear conflict among other jurisdictions and some indication in *Frantz* that the Nevada Supreme Court may adopt the plain language interpretation, however, Plaintiffs should be permitted to allege noncontractual claims for misappropriation of confidential information that does not constitute a trade secret.

*Id.*

In the years since *Newmark* and *Frantz*, the Supreme Court of Nevada has still not provided clear guidance as to the NUTSA misappropriation provision's preemption of other trade secret (or proprietary information) statutes. However, two post-*Newmark* cases provide some additional guidance. In *Fortunet, Inc. v. Coronel*, the Supreme Court of Nevada affirmed dismissal at summary judgment on a conversion claim where the property converted "fell within the express ambit of material that [the plaintiff] had claimed to be protectable trade secrets at that point in the litigation." 554 P.3d 210 (Nev. 2024). The court explained:

> Fortunet's appellate briefing . . . recites essentially the same facts in support of its conversion and civil conspiracy claims that it cited with respect to its UTSA claim. Since nearly all of Fortunet's conversion and civil conspiracy claims, except for its allegations of misuse of employee labor, were "based upon" the same allegations as its UTSA claim, the district court did not err in concluding that Fortunet's conversion and civil conspiracy claims were partially precluded by NRS 600A.090.

*Id.* (citing *Frantz*, 999 P.2d at 357). And a recent Ninth Circuit case applying NUTSA, *H&H Pharmaceuticals, LLC v. Chattem Chemicals, Inc.* held that several of the plaintiff's claims were preempted by NUTSA because "all of H&H's causes of action sounding in tort and restitution are based upon H&H's allegations that Chattem and Sun misappropriated H&H's confidential information . . . ." 2024 WL 1734134, at *1 (9th Cir. Apr. 23, 2024). The court noted that "in its amended complaint, H&H expressly defined these conversion methods as 'trade secrets, as defined in the Nevada Uniform Trade Secrets Act'" and sought defendants' profits—a theory of recovery available under NUTSA. *Id.*

1    These cases do not represent binding case law for which there is a clear answer in this

2    case but suggest a shift toward the "majority" view that NUTSA preempts non-NUTSA claims

3    sounding in tort that are based upon the same allegations. I predict that the Supreme Court of

4    Nevada will ultimately join other states in adopting this position.[11] Based on the information

5    before me, I agree with the Hawaii Supreme Court that "[p]ermitting litigants in UTSA states to

6    assert common-law claims for the misappropriation or misuse of confidential data would reduce

7    the UTSA to just another basis for recovery and leave prior law effectively untouched." *BlueEarth*

8    *Biofuels, LLC*, 235 P.3d at 321. And further, following the minority view would render the

9    provision that NUTSA "displaces conflicting tort, restitutionary, and other law of this state

10   providing civil remedies for misappropriation of a trade secret" effectively meaningless.

11   Therefore, I evaluate whether ImageKeeper's claims under § 603.050—whether "trade secrets"

12   for purposes of NUTSA or simply as proprietary information—are preempted by NUTSA,[12] and

13   I find that they are.

14        As the defendants point out, the "copying" element of § 603.050 is nothing more than a

15   variant of misappropriation, and the statute otherwise serves the same function as NUTSA

16   misappropriation. ImageKeeper pleads the same facts as a basis for both its NUTSA

17   misappropriation and § 603.050 claims, going so far as to present identical allegations and argue

18   that because they have inadequately pled five of their claimed alleged Trade Secrets, they are

19   entitled to maintain their § 603.050 claims on these five claimed pieces of "proprietary and

20   confidential" information. This defeats the purpose of the preemption provision of NUTSA

21

22   ———————————

23   [11] When a federal court interprets state law, it is bound by the decisions of the state's highest court. *Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557, 560 (9th Cir. 2004). Where the state's highest court has not decided the issue, a federal court must predict how that court would decide. *Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007). I may use "decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Assurance Co.*, 379 F.3d at 560 (quotation omitted).

25   [12] I note that at the motion to dismiss stage, ImageKeeper was allowed to plead their § 603.050 claims in the alternative. ECF No. 170 at 7–9. However, this ruling was made in 2021, before both *Fortunet* and *H&H*, both cases from 2024. With this new information, I find that ImageKeeper cannot claim § 603.050 in the alternative to its NUTSA claim.

misappropriation entirely. Therefore, Count 3 is preempted by NUTSA, and the defendants'

motion for summary judgment as to Count 3 is granted.

> ### b. *Count 7 (NCCL; NRS 205.4765, 205.477, 205.511), Count 9 (Unfair Trade Practices; NRS 603.080, 603.040), and Count 11 (Unfair Competition/Breach of the Duty of Loyalty)*

ImageKeeper's NCCL claim (Count 7) is based on the allegation that defendants

"without authorization, used, transferred, took, made copies of, obtained or attempted to obtain

access to . . . " their servers. ECF No. 68 at ¶¶ 134–39. Its Unfair Trade Practices claim (Count 9)

is based on the allegation that "Defendants, either directly or through others, gained access to

data stored in a computer [Plaintiff's server], with the intent to convert the data to their own

use, which is an unfair trade practice." *Id.* at ¶ 154. ImageKeeper's Unfair Competition/Breach of

the Duty of Loyalty claim (Count 11), levied only against Wright, alleges that "Wright []

breached its duty of loyalty by illegally copying and disclosing [Plaintiff's] Trade Secrets and

confidential information. . . ." *Id.* at ¶ 164. Defendants argue that these claims are all duplicative

of ImageKeeper's NUTSA misappropriation claims, which are based on the same factual

allegations, and therefore are preempted. ECF No. 318-1 at 28; *see also* ECF No. 316 at 14.

ImageKeeper responds that, for all three claims, the information it claimed as Trade Secrets 1, 2,

4, 5, and 7, no longer implicating NUTSA, cannot be preempted by the statute, in addition "to

other confidential information identified by ImageKeeper as separate and distinct from the

information in Trade Secret Nos. 3 and 6 (the only trade secrets now at issue)." ECF No. 321 at

28.

ImageKeeper once again relies on the premise that it can use the claims already deemed

insufficiently pled as trade secrets for purposes of these other statutes. However, in making this

"alternative" pleading argument, it acknowledges that its claims are premised on identical facts

arising from the same "single factual episode" as plaintiff's NUTSA misappropriation claims.

Consequently, each of these is preempted by NUTSA. Defendants' motion for summary

judgment as to Counts 7, 9, and 11 is granted.

### 4. *Deceptive trade practices (Count 8)*

Defendants argue that claims under the Nevada Deceptive Trade Practices Act (NDTPA) require a higher pleading standard because they sound in fraud under Federal Rule of Civil Procedure 9(b). ECF No. 318-1 at 29 (citing *Elko, Inc. v. WTH Com. Servs., LLC*, 2023 WL 6141623, at *9 (D. Nev. Sept. 20, 2023) and *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1174 (D. Nev. 2021)). They state that ImageKeeper, as is required under the higher fraud pleading standard, fails to allege the "'who, what, when, where and how' of the alleged fraudulent misconduct." *Id.* (quoting *Elko, Inc.*, 2023 WL 6141623, at *9 and citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). They point to ImageKeeper's allegations that Wright, "upon information and belief, "knowingly made false representations as to the source, sponsorship, approval or certification of the competing Wright Flood application"; "disparaged the goods, services or business of [Plaintiff] by making false or misleading representation of fact"; and "failed to disclose a material fact in connection with the sale or lease of goods or services," namely that Wright purportedly had "no intention of honoring its contractual . . . obligations," planned to "reverse engineer" ImageKeeper's "technology to develop a clone product." *Id.* at 29–30 (quoting ECF No. 68 at ¶¶ 143–45). They argue that ImageKeeper has failed to allege the "'time, place, or content' of alleged false statements (aside from the mention of one adjusting firm, Colonial Claims), nor is there evidence supporting the alleged omission of material 'facts' as pleaded." *Id.* at 30 (quoting *Elko, Inc.*, 2023 WL 6141623, at *9 (dismissing same claim where "there [we]re no allegations as to when or where such misrepresentations were made—or even to which customers, besides Customer One.")).

In its response, ImageKeeper writes that "despite citing to three examples from the Verified First Amended Complaint, Wright Flood only argues that there is no evidence of false statements made to Colonial Claims, an adjusting firm that used the ImageKeeper System." ECF No. 321 at 29. It goes on to explain that the factual record shows that Wright contracted with

ImageKeeper in the 2019 SSA, a binding two-year non-compete provision regarding the ImageKeeper System, while simultaneously contracting Evoke to make a similar system. *Id.*

I start by noting that ImageKeeper mischaracterizes the defendants' argument about Colonial Claims: defendants state that in the AC there is *only* mention of Colonial Claims, not that there is no evidence of false statements made to Colonial Claims. However, the evidence to which ImageKeeper points are three excerpts from depositions, which sufficiently raise a genuine issue of material fact, even under the higher pleading standard.

First, ImageKeeper cites to the deposition of Rule 30(b)(6) witness Patricia Templeton-Jones who states that she knew that at the time the SSA was signed, she was aware that Evoke was also being retained to develop the Wright Flood application. ECF No. 321-4 at 15. Templeton-Jones testified that she did not tell ImageKeeper Founder and CEO Jerry Speasl this information at that time. *Id.* Second, ImageKeeper cites Timothy Love's deposition, in which the witness was asked about kickoff meeting notes stating "We still have a contract with ImageKeeper and we will continue to work with them. If you are talking to anyone at ImageKeeper, please do not say anything about Evoke. It is business as usual." ECF No. 321-5 at 18. The witness acknowledged that he led the team to whom this was presented and stated only that those were "possibly" his instructions. *Id.* Third, ImageKeeper cites to Cathy Chafin's deposition where she stated she was first made aware that "ImageKeeper was not to be notified of the Evoke relationship" during the "kickoff meeting." ECF No. 123-7 at 6.

In the light most favorable to ImageKeeper, these transcripts identify several individuals at Wright who were involved in keeping the information about Evoke away from ImageKeeper (the "who" and "what"), point to the fact that Wright purposely did not intend to inform ImageKeeper of the relationship with Evoke (the "how"), and acknowledge that this occurred at the "kickoff meeting" (the "when" and "where"). Thus, ImageKeeper has thus presented enough factual background to overcome the Rule 9(b) pleading standard.

Defendants then argue that ImageKeeper cannot show economic damages, as is required by the NDTPA, because "[t]he SSA provided for payment to Plaintiff on a per claim basis, had no minimum requirements, and Wright paid Plaintiff for every claim Plaintiff's system processed." ECF No. 318-1 at 30 (citing ECF No. 263 at 21–22 and *Leigh-Pink v. Rio Props., LLC*, 512 P.3d 322, 328–29 (Nev. 2022) ("[A] plaintiff is not damaged for purposes of . . . an NRS 41.600 consumer fraud claim when they receive the true value of the good or service purchased.")). ImageKeeper responds that *LeighPink* is distinguishable; the plaintiffs there sought recovery of their resort fees after not being informed by the Rio Hotel that two previous hotel guests had contracted Legionnaire's disease. ECF No. 321 at 29–30 (citing *Leigh-Pink*, 512 P.3d at 324). The Supreme Court of Nevada decided that because the plaintiffs ultimately received all of the benefits of their resort fees, there were no economic damages. *Id.* (citing *Leigh-Pink*, 512 P.3d at 327). ImageKeeper argues that, here, it was induced into the SSA, which included a two-year non-compete provision. *Id.* at 30. It asserts that it faced economic damages that resulted from this agreement because "ImageKeeper could not market its own product all the while Wright Flood was secretly misappropriating the same." *Id.*

I agree that this situation is distinguishable from *Leigh-Pink* and find that ImageKeeper has alleged damages for purposes of NRS 41.600. In *Leigh-Pink*, the Supreme Court of Nevada found that the plaintiffs received the "true value" of their resort fees, and "the legionella bacteria [did not] impede their access to the phones, computers, or fitness room included in the resort fees." *Leigh-Pink*, 512 P.3d at 324, 328. As the court explained, it was asked to decide the following question based on an earlier decision in the litigation:

> For purposes of a fraudulent concealment claim, and for purposes of a consumer fraud claim under NRS 41.600, has a plaintiff suffered damages if the defendant's fraudulent actions caused the plaintiff to purchase a product or service that the plaintiff would not otherwise have purchased, even if the product or service was not worth less than what the plaintiff paid?

*Leigh-Pink*, 512 P.3d at 324. (quoting *Leigh-Pink v. Rio Props., LLC*, 989 F.3d 735, 738 (9th Cir. 2021)). Here, ImageKeeper has sufficiently alleged that the SSA *was* worth less than Wright represented because of the non-compete. Reading the facts in the light most favorable to ImageKeeper, the SSA was worth much less if Wright was—at the time the agreement was signed—already seeking to have the services agreed to in the SSA performed by another company. In effect, ImageKeeper was locked into a deal with Wright, while Wright was both benefiting from and undermining ImageKeeper at the same time. That Wright "paid for every claim it sent through Plaintiff's portal" does not address the diminished value of the SSA itself. *See* ECF No. 333 at 20. Therefore, summary judgment is denied as to Count 8.

### 5.  *Implied Covenant of Good Faith and Fair Dealing – Tort (Count 10)*

ImageKeeper alleges that Wright "breached its duty of good faith and fair dealing by deliberately contravening the terms of the SSA and undermining the intention and spirit of the SSA . . . ." AC, ECF No. 68 at ¶ 158. Defendants argue that, to the extent this claim is grounded in tort (rather than contract), an implied covenant of good faith and fair dealing claim in tort only arises "'in rare exceptional cases' when there is a special relationship between the victim and tortfeasor." ECF No. 318-1 at 30 (quoting *Pelletier v. Rodriguez*, 2021 WL 3008592, *9 (D. Nev. Jul. 15, 2021)[13] (quoting, in turn, *Ins. Co. of the W. v. Gibson Tile Co.*, 134 P.3d 698, 702 (Nev. 2006))). A "special relationship" is "characterized by elements of public interest, adhesion, and fiduciary responsibility" and includes relationships like "insurers and insureds, partners of partnerships, and franchisees and franchisors." *Ins. Co. of the W.*, 134 P.3d at 702. Defendants insist that there was no special relationship between the parties—the SSA was negotiated at arm's length by sophisticated parties and provided that Wright and ImageKeeper were "independent contractors, and no agency, partnership, joint venture or employer-employee relation is intended or created by this Agreement." ECF No. 318-1 at 31 (citing SSA, ECF No. 235-5 at § 13.8). In

---

[13] The court notes that Wright included an erroneous citation. The correct citation is *Pelletier v. Rodriguez*, 2021 WL 3008594, at *1 (D. Nev. July 15, 2021).

response, ImageKeeper argues that the parties did maintain a special relationship because "ImageKeeper relied on Wright Flood to keep ImageKeeper's trade secrets and confidential information secret." ECF No. 321 at 30. "ImageKeeper further relied on Wright Flood not to deliberately and secretly bypass its authorization to work covertly with Evoke to develop a competing application." *Id.* (internal citations omitted).[14] ImageKeeper provides no case law to support this assertion, and I find there has been no showing that the parties maintained a "special relationship" that would justify a tort claim for violation of the implied covenant of good faith and fair dealing. Therefore, I grant summary judgment on Count 10 to the extent that it is grounded in tort.[15]

### B. Computer access law claims (Counts 5 and 6)[16]

ImageKeeper raises claims under the Stored Communications Act and Computer Fraud and Abuse Act; defendants seek summary judgment on both.

### 1. ImageKeeper's SCA claim

The SCA provides a cause of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage . . . ." 18 U.S.C. §§ 2701(a), 2707. ImageKeeper alleges that the defendants violated both prongs of the SCA. FAC, ECF No. 68 at ¶¶ 111–14. It alleges first that it believed Wright would "honor its contractual obligations" and Wright purportedly "concealed its intention to access the system for the purpose of reverse engineering the underlying trade secrets and confidential information." *Id.* Specifically, Wright's access was allegedly unauthorized because by concealing

---

[14] Because I find that there is no special relationship between Wright and ImageKeeper, I do not address ImageKeeper's argument regarding SSA obligations. *See* ECF No. 321 at 31. Additionally, as defendants mention in their reply, arguments grounded in the SSA suggest that ImageKeeper intends to only pursue this claim as grounded in contract. ECF No. 333 at 21.

[15] To the extent that this claim is grounded in contract, this is discussed *infra.*

[16] Count 7 is also a computer access law claim, but as is discussed earlier, it is preempted by ImageKeeper's NUTSA claims.

its true intentions, Wright "vitiated" ImageKeeper's consent to the otherwise authorized access. *Id.* at 113.

Regarding the first prong,[17] **the** defendants argue that Wright's access was never unauthorized. ECF No. 318-1 at 31. They assert that there was no deceit, but even if there were, "[n]ot all deceit vitiates consent." *Id.* (quoting *Theofel v. Farey-Jones*, 359 F.3d 1066, 1073 (9th Cir. 2004)). Wright explains that vitiated consent is treated like trespass in which a party gains access through false pretenses or a known mistake, but here Wright has had continued authorized access to use ImageKeeper's servers since 2016—including throughout the duration of the SSA. *Id.* at 31–32 (citing *In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 452–53 (N.D. Cal. 2018), *on reconsideration in part*, 386 F. Supp. 3d 1155 (N.D. Cal. 2019)). In response, ImageKeeper argues that the SSA "imposed strict limitations on Wright Flood's access to the ImageKeeper System as well as Wright Flood's pre-approved end-users." ECF No. 321 at 31 (citing SSA, ECF No. 235-5 at § 6.2 ("Customer may grant employees, agents and third parties (each an 'End User') access to the Service. Each such End User must execute a 'click through' EULA/Terms & Conditions in connection with such access")). And, under the SSA, "no username or password will be utilized at any time by any person other than the End User to whom such username or password was originally assigned." *Id.* (quoting ECF No. 235-5 at § 6.3). It insists that by providing the login credentials to Evoke for the purposes of allowing Evoke to create a competing system, Wright vitiated its consent. *Id.* at 32. Defendants, in their reply, assert that there is no SCA violation where an authorized party grants a third-party access to information intended for the authorized party. ECF No. 333 at 22 (citing *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 880 (9th Cir. 2002)). They also argue that Evoke was not an "End User" for purposes of the SSA because it was not a consumer but a consultant. *Id.*

---

[17] Defendants' argument regarding the "exceeded authorization" prong is effectively the same as their argument regarding vitiated consent. *See* ECF No. 318-1 at 32. I deny summary judgment for the same reasons as the first prong.

I find that there remains a genuine dispute of material fact regarding vitiated consent. Defendants argue, for the first time in their reply,[18] that Evoke was not an "End User." Viewing the facts in the light most favorable to ImageKeeper, I disagree with Evoke's argument. Evoke's goals may have been different from the prototypical user of the app—seeing as, according to ImageKeeper, it was attempting to reverse engineer the technology—but sufficient evidence has been submitted that suggests Evoke used the functions of the app like another user might, including logging in and posting requests. *See* Alla email, ECF No. 271-4 at 18 ("When you are posting any requests to [ImageKeeper] test system, make sure you are doing from US region EC2 instance. [ImageKeeper] should not be aware that someone from India is accessing their system. Tim wanted to keep it confidential till they switch from [ImageKeeper] system."). I thus find that there is a genuine dispute of material fact as to whether Evoke, in its role as a "consultant," was nonetheless an "End User" as contemplated by the SSA. Further, defendants cite to *In re Apple Inc. Device Performance Litigation* in arguing that not all deceit vitiates consent but fail to read further: "Plaintiffs do not, for example, allege that Apple posed as someone else . . . in order to gain access to Plaintiffs' iPhones." *In re Apple Inc.*, 347 F. Supp. 3d at 452–53. Here, ImageKeeper alleges that Wright provided ImageKeeper app access to Evoke—which required Evoke to use Wright's particularized login credentials—and took significant steps to conceal Evoke's repeated access and use of the app. Although Wright was unquestionably granted access to the app by the SSA, by granting access to Evoke in the manner that it did, consent may have been vitiated.[19]

---

[18] It is inappropriate to raise an argument for the first time in a reply brief because it deprives your opponent of the change to respond to the argument. *See Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) (citing *Thompson v. Commissioner*, 631 F.2d 642, 649 (9th Cir. 1980)). Evoke is cautioned that the court will disregard or strike improperly lodged reply arguments in the future. However, for efficiency, the court nonetheless addresses the argument here.

[19] Defendants also argue that ImageKeeper cannot prove actual damages as is required under the SCA. ECF No. 318-1 at 32–33. They allege that unjust enrichment is unavailable because a valid contract governs the subject matter at issue and ImageKeeper has not provided evidence of lost revenues or profits, its supposed damages. *Id.* (citing *United States v. Sierra Range Constr.*, 2024 WL 1377642, at *8 (D. Nev. Mar. 31, 2024)); ECF No. 333 at 22. ImageKeeper does not address this in its response. However, as discussed throughout this order, ImageKeeper has raised a genuine dispute of material fact as to the

In its motion for summary judgment, Evoke separately argues that the SCA is inapplicable under *Theofel*. "The [SCA] provides a cause of action against anyone who 'intentionally accesses without authorization a facility through which an electronic communication service is provided and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage" and, here, ImageKeeper has provided no evidence that Evoke obtained, altered, or prevented authorized access to "electronic communications." ECF No. 316 at 15 (quoting *Theofel*, 359 F. 3d at 1072). It asserts that even if it is accused of accessing, using, and testing the ImageKeeper system, it "took no communications, altered no communications, and prevented no authorized access to a wire or electronic communication." *Id.* In response, ImageKeeper states that the evidence shows its system "supports and communicates simultaneously with thousands of connected devices, including mobile devices, insurance providers, carriers, adjusting firms, adjusters, and individual policyholders" and communicates "multi-part messages and documents, generates and delivers email notifications, generates and delivers entire report packages, and provides real-time updates in addition to 'images, data, annotations, and [adjuster] comments.'" ECF No. 325 at 30 (citing FAC, ECF No. 68; Suppl. resps. to interrogs., ECF No. 271-2 at 12, 22, 25, 29 ("The ImageKeeper System is a complex multi-tenant system that supports and communicates simultaneously with thousands of connected devices, including mobile devices."); Patterson 30(b)(6) dep. tr., ECF No. 326-2 at 16. It points to the activities that Evoke conducted on the ImageKeeper app, all of which created a documentary record in ImageKeeper's system—facts that Evoke has never disputed. *Id.* at 30–31.

I agree that summary judgment is not warranted on the SCA claim at this time. As discussed previously, ImageKeeper has sufficiently presented evidence to raise a genuine dispute of material fact as to whether Evoke was an unauthorized user. Further, there is sufficient

---

economic damages it suffered as a result of the alleged unauthorized access to its system granted by Wright to a company developing a competing application.

1    evidence in the record to show that Evoke's activities, using Wright's login credentials, were

2    stored in ImageKeeper's systems, and ImageKeeper is an electronic communication service for

3    purposes of the statute. Therefore, I deny both summary judgment motions as to ImageKeeper's

4    SCA claim.

5                                    *2.   ImageKeeper's CFAA claim*

6          ImageKeeper raises CFAA claims under 18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. §

7    1030(a)(4).  For both, a civil action is available if the violation involves at least one type of loss or

8    damage listed under § 1030(c)(4)(A)(i). Relevant here first is 18 U.S.C. § 1030(c)(4)(A)(i)(I),[20]

9    which requires that there be a "loss to 1 or more persons during any 1-year period . . . aggregating

10   at least $5,000 in value[.]" Under 18 U.S.C. § 1030(g) of the CFAA, "[d]amages for a violation

11   involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic

12   damages." Loss under § 1030(c)(4)(A)(i)(I) is defined as "any reasonable cost to any victim,

13   including the cost of responding to an offense, conducting a damage assessment, and restoring

14   the data, program, system, or information to its condition prior to the offense, and any revenue

15   lost, cost incurred, or other consequential damages incurred because of interruption of

16   service[.]" 18 U.S.C. § 1030(e)(11). Despite ImageKeeper's uncited assertion that it need not

17   assert economic loss for some of its claims, in actuality, it must demonstrate economic loss for all

18   of its CFAA claims. *Compare* ECF No. 321 at 33 ("To the extent ImageKeeper requests

19   compensatory damages for conduct alleged under 18 U.S.C. § 1030(c)(4)(A)(i)(I), it would be

20   limited to that related to economic harm. For compensatory damages for conduct alleged under

21   18 U.S.C. § 1030(a)(2)(C), compensatory damages would not be limited to only economic

22   harm."), *with United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084, 1094 n.6 (W.D. Wash.

23   2022) (addressing claims under 18 U.S.C. § 1030(a)(4) and 18 U.S.C. § 1030(a)(2), "TST

24

25   [20] ImageKeeper also alleges violations of 18 U.S.C. § 1030(c)(4)(A)(i)(VI), which describes harms
     resulting from "damage affecting 10 or more protected computers during any 1-year period[.]" Violations
26   of § 1030(c)(4)(A)(i)(VI) are excluded altogether from § 1030(g), so ImageKeeper cannot bring a private
     right of action under this statute.

incorrectly asserts that the $5,000 'loss' threshold applies only to claims brought under 18 U.S.C. § 1030(a)(4). 18 U.S.C. § 1030(g) is clear, however, that a party may only bring a civil claim for violation of the CFAA if the claim involves one of the factors enumerated in 18 U.S.C. § 1030(c)(4)(A)(i). *See* 18 U.S.C. § 1030(g).").

Defendants argue that loss is narrowly construed, and that it only applies for technological harms like corrupted files. ECF No. 318-1 at 33 (citing *Van Buren v. United States*, 593 U.S. 374, 391–92 (2021) ("The term 'loss' likewise relates to costs caused by harm to computer data, programs, systems, or information services. § 1030(e)(11). The statutory definitions of 'damage' and 'loss' thus focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data.") and *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262–63 (9th Cir. 2019) ("We further observe that the CFAA is 'an anti-hacking statute,' not 'an expansive misappropriation statute.'" (quoting *United States v. Nosal*, 676 F.3d 854, 857 (9th Cir. 2012) (en banc))). They assert that ImageKeeper's only support for loss it suffered are vague allegations that Wright "altered the normal mode" by which ImageKeeper's servers operate and "impaired the integrity" of the system. *Id.* (quoting FAC, ECF No. 68 at ¶ 12).

Regarding 18 U.S.C. § 1030(c)(4)(A)(i)(I), ImageKeeper responds that "Wright Flood and Evoke impaired the ImageKeeper System through illicit access and use." ECF No. 321 at 33. It argues that it expended "time, effort, and costs to assess the extent of Wright Flood and Evoke's illicit access and use of the ImageKeeper System and restoring the data, programs, and information in the ImageKeeper System to its condition prior to Evoke's offenses," all of which represent response costs, one type of economic damage. *Id.* It "determined that between December 2019 and May 2020, Wright Flood and Evoke had accessed the protected front and backend of the Secure Portal of the ImageKeeper System and cloud system located in Las Vegas, Nevada over 600 times." *Id.* (citing FAC, ECF No. 68 at ¶ 55; ECF No. 321-13; Suppl. resps. to interrogs., ECF No. 271-2 at 32–37). It then asserts that its response costs exceeded $5,000 in

aggregate and cites to a May 15, 2023 declaration from owner and CEO Jerry Speasl. *Id.* at 34 (citing ECF No. 271-10 at 3).

In their reply, the defendants point out that ImageKeeper could not substantiate its "response costs" until providing the Speasl declaration, which was not in ImageKeeper's discovery responses and first attached in its response to the defendants' prior motion. ECF No. 333 at 23. They also describe the declaration as being vague and conclusory.

Regardless of the validity of the Speasl declaration, ImageKeeper is not entitled to relief under the CFAA because it has not demonstrated economic loss. Prior to the *Van Buren* decision, courts in this circuit had taken a relatively expansive view of what constitutes a "response cost." *See, e.g., Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 894 (N.D. Cal. 2010) ("[I]t is not necessary for data to be physically changed or erased to constitute damage to that data."); However, this is no longer the case. As the Ninth Circuit explained in *hiQ Labs, Inc. v. LinkedIn Corporation*, "*Van Buren* reviewed the statutory definitions of 'damage' and 'loss' and concluded that this civil remedies provision requires a showing of 'technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data.'" 31 F.4th 1180, 1195 n.12 (9th Cir. 2022) (citing 593 U.S. 391–92 (interpreting 18 U.S.C. § 1030(e)(8), (e)(11), (g))). This far more limited interpretation of the CFAA comports with the notion that it is an "anti-hacking statute" and not just "an expansive misappropriation statute." *Andrews*, 932 F.3d at 1262–63 (quoting *Nosal*, 676 F.3d at 857). Here, ImageKeeper has not alleged a technological harm. At best, it has stated that it spent significant time and cost investigating the alleged unauthorized access, but aside from pointing to several hundred entries showing that Evoke used its app—in a manner that appears hardly different from another user, and many of which say nothing more than "User Signed In"—there is no demonstrated loss here for purposes of the CFAA. *See* ECF No. 321-13. Having found that ImageKeeper has not demonstrated loss

1 under the CFAA, it is unable to sustain its CFAA claims, so I grant summary judgment to

2 defendants on the CFAA claims.[21]

3       **C. Contract claims (Counts 4, 10, and 12)**

4       Defendants next argue that ImageKeeper's contract claims fail. Counts 4 and 10 only

5 implicate Wright and Count 12 only implicates Evoke.

6           *1. Breach of contract against Wright (Count 4)*

7       In Nevada, a breach of contract is a "material failure of performance of a duty arising

8 under or imposed or imposed by agreement." *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev.

9 1987). A claim for breach of contract requires: "(1) the existence of a valid contract; (2) that the

10 plaintiff performed or was excused from performance; (3) that the defendant breached the

11 contract; and (4) that the plaintiff sustained damages." *Miller v. Weinmann*, 2023 WL 5428644, at

12 *4 (D. Nev. Aug. 23, 2023) (citing *Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000)).

13 ImageKeeper alleges the following breaches of the SSA:

14       "[M]isappropriating, misusing, divulging, and/or copying ImageKeeper's
15       confidential and proprietary property and information, including its Trade
      Secrets;"

16       "[I]llegally providing, transferring, or sharing the totality of those to unknown and
17       unauthorized individuals;"

18       "[R]everse engineering, reverse assembling, decompiling or otherwise attempting
19       to derive source code from the ImageKeeper's software;"

20       "[F]ailing to comply with the security, password, and authorization protocols and
      requirements;"

21
22       "[D]irectly or indirectly soliciting and usurping ImageKeeper's business
      opportunities and adjuster claims, and by making and offering a competing
23       product;" and

24

25 ────────────────

26 [21] Because I find that there is no dispute of material fact as to the loss ImageKeeper incurred, and therefore grant defendants' motion for summary judgment, I do not address the Evoke's motion's CFAA arguments. *See* ECF No. 316 at 16–17.

"[F]rustrating the purpose of the SSA and agreements made therein . . . that Wright Flood will honor its promises to use the ImageKeeper System, and not another product."

ECF No. 68 at ¶¶ 100–04.

Defendants first argue that ImageKeeper's failure to prove misappropriation as to alleged Trade Secrets 3 and 6 prevent it from proving breach because (1) "neither Wright nor Evoke had access to Plaintiff's source code or the allegedly 'proprietary' formula identified as Alleged Trade Secret 6"; (2) "as discussed . . . regarding . . . Alleged Trade Secret 3, any disclosure of the API Documentation to Evoke, as Wright's consultant, was permissible under to Section 7.1 of the SSA"; (3) Wright could not have "illegally provid[ed], transferr[ed], or shar[ed] the totality of those to unknown and unauthorized individuals"; and (4) "neither Wright nor Evoke attempted to 'reverse engineer' any source code." ECF No. 318-1 at 36. As is previously described in this order, ImageKeeper *has* alleged sufficient facts to create a dispute of material fact regarding alleged Trade Secret 6. As to alleged Trade Secret 3, although I did find that this claim cannot continue, I did not make this finding based on the defendants' contention that Evoke was a "consultant" and therefore not implicated by the SSA. Likewise, I found that there is a genuine dispute of material fact as to whether Evoke was an unauthorized user, and whether Wright's authorization vitiated when it provided login credentials to Evoke. *See supra* p. 32. I likewise find, in line with my earlier findings, that there are sufficient facts in the record to suggest, in the light most favorable to ImageKeeper, that even if defendants were not trying to duplicate the ImageKeeper app exactly, they were trying to reverse engineer some of its functions. *See* Alla dep., ECF No. 325-1 at 4 (The Wright Flood app had "a reserve value, damage value fields where there was some logic which Wright Flood wanted to do."). Therefore, I do not find the defendants' argument persuasive.

Defendants next argue that the SSA allowed them to grant access to "End Users,"—including "employees," "agents," or "third parties"—who must comply with certain security, password, and authorization protocols and requirements. ECF No. 318-1 at 37 (quoting the SSA,

ECF No. 235-5 at §§ 6.2–6.4). They assert that Evoke was a "consultant" and therefore excluded from this requirement in the SSA. But as discussed in further detail regarding the SCA claim, there is a genuine dispute of material fact as to whether Evoke, in its role as a "consultant," was nonetheless an "End User" as contemplated by the SSA. Thus, I deny the defendants' motion for summary judgment as to the breach of contract claim.

### 2. *Implied Covenant of Good Faith and Fair Dealing – Contract (Count 10)*

Defendants argue that under the SSA, Wright was under no obligation to use the ImageKeeper system; "[n]othing prevented Wright from processing claims a different way, or from developing its own mobile application. The SSA expressly allowed Wright to share the API Documentation with its consultant, Evoke." ECF No. 318-1 at 37. In response, ImageKeeper asserts that "[t]he SSA did *not* include an obligation for Wright Flood to use the ImageKeeper System. But the SSA *did* include an obligation for Wright Flood not to provide login credentials created specifically for Tim Love to Evoke so that Evoke could access and clone the ImageKeeper System." ECF No. 321 at 31 (citing SSA, ECF No. 235-5 at § 6.3 and Love dep. tr., ECF No. 321-5 at 9). In their reply, defendants again argue that neither Wright nor Evoke ever had access to the source code, so they could not have been attempting to reverse engineer the app. ECF No. 333 at 25. They also assert that all of ImageKeeper's "allegations concerning breach of the implied covenants depend on breaches of the terms of the SSA" and it is not permitted to simply point to identical allegations for both claims. *Id.* (citing *Douglas Coder & Linda Coder Family LLLP v. RNO Exhibitions, LLC*, 2020 WL 5995495, *4 (D. Nev. Oct. 9, 2020)).

I find that, even read in the light most favorable to ImageKeeper, the AC does not sufficiently differentiate the implied covenant claim from the breach of contract claim. A breach of the implied covenant of good faith and fair dealing may be pled in the alternative to a breach

of contract claim. *See, e.g., Yaghyazarian v. Progressive Direct Ins. Co.*, 2023 WL 9492258, at *2 (D. Nev. July 20, 2023). In the AC, ImageKeeper states the following in support of Count 10:

> Wright Flood breached its duty of good faith and fair dealing by deliberately contravening the terms of the SSA, and undermining the intention and spirit of the SSA, and in so doing, wrongfully prevented ImageKeeper from receiving the benefits to which it is entitled.
>
> In addition to the facts alleged above, Wright Flood abused its relationship with ImageKeeper in order to gain access to ImageKeeper's trade secret information, as well as confidential information that may not constitute a trade secret. Wright Flood's bad faith and unfair dealings are evident by its subsequent divulging of that information to unauthorized foreign entities and then using that information to harm ImageKeeper by replicating the technology to create a competing product. Indeed, the SSA included a mechanism for Wright Flood to request authorization from ImageKeeper for Wright Flood employees, affiliates and third-parties. The fact that Wright Flood deliberately and secretly bypassed those mechanisms to work covertly with unknown foreign agents further highlight the unfair, clandestine nature of Wright Flood's activities.

ECF No. 68 at 42–43 (paragraph numbers omitted). This is largely a restatement of the allegations in the breach of contract claim. Nevada law sets a relatively low threshold for alternative pleading of these claims. In *ESC-Toy Ltd. v. Sony Interactive Entertainment LLC*, the court, applying Nevada law, addressed a similar argument:

> Sony contends that ESC's allegations are insufficient because "they simply restate its breach of contract claims" regarding the exclusivity term of the EVA. However, as discussed *supra*, the complaint clearly alleges that Sony, in addition to breaching its contractual obligations under the EVA, performed in a manner that was contrary to the spirit and purpose of the EVA by denying ESC its justified expectations.

2021 WL 4815272, at *3 (N.D. Cal. July 27, 2021) (internal citation omitted); *see also P&H Casters Co., Inc. v. P&H Indus., LLC*, 2024 WL 4446546, at *5 (C.D. Cal. Aug. 26, 2024) (noting specifically that *ESC-Toy* applied Nevada law and rejecting its applicability to a California breach of implied covenant case). However, unlike in *ESC-Toy*, ImageKeeper's allegations in support of its implied covenant claim do not add any new allegations. Instead, they are nothing more than a repackaging of its contract claim. That Wright "deliberately contravene[ed] the terms of the

SSA, and undermin[ed] the intention and spirit of the SSA" indistinguishably maps the breach of contract allegations that Wright "breached the SSA by misappropriating, misusing, divulging, and/or copying ImageKeeper's confidential and proprietary property and information, including its Trade Secrets" and "frustrat[ed] the purpose of the SSA and agreements . . . ." *Compare* ECF No. 68 at 42, *with* ECF No. 68 at 30–31. The remaining implied covenant allegations are restatements of the allegations that Wright wrongly provided Evoke login information to use for the purpose of reverse engineering the ImageKeeper app. I find that even under Nevada's low threshold for arguing these claims in the alternative, ImageKeeper has not sufficiently explained how every allegation under the breach of implied covenant claim is not already covered by its breach of contract claim against Wright. Therefore, summary judgment is granted as to the breach of the implied covenant of good faith and fair dealing claim against Wright to the extent that it is grounded in contract.

### 3. Breach of contract against Evoke (Count 12)

In Count 12, ImageKeeper alleges that Evoke violated the ImageKeeper app End-User License Agreement (EULA), which they would have had to have accepted and which stated that they agreed not to "reproduce the Software[;] . . . modify, adapt, translate the Software, or create any derivative works thereof; [or] . . . attempt to decompile, disassemble, reverse engineer, or otherwise attempt to derive the source code for the Software . . . ." ECF No. 68 at 44–45 (citing EULA, ECF No. 68-6 at 2).

To succeed on a breach of contract claim, the plaintiff must show that (1) a valid contract exists, (2) plaintiff performed its obligations; (3) defendant failed to perform its obligations; and (4) damages. *Desert Valley Contracting, Inc. v. In-Lo Props.*, 2021 WL 818191, at *2 (Nev. 2021) (citing *Richardson v. Jones*, 1 Nev. 405, 408–09 (1865)). For a valid contract, there must be an offer, acceptance, meeting of the minds, and consideration. *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005).

Evoke argues first there is no proof of acceptance. It contends that ImageKeeper cannot maintain the simultaneous arguments that (1) Evoke was not granted permission to access its system, in which case "there could be no meeting of the minds as to any type of license agreement, let alone an 'end-user agreement' not designed for Evoke" and (2) that Evoke "would have had to accept" the EULA "via a click-through agreement." ECF No. 316 at 19 (citing ECF No. 68 at 44). It argues that, if it had agreed to the click-through agreement, ImageKeeper would have to have been able to produce *some* evidence of this, which it has not. *Id.* It also argues that the EULA's statement that "if you do not agree to the terms of this agreement . . . do not install, activate, copy, or use the software," *id.* at 20 (citing EULA, ECF No. 68-6 at 2), is insufficient to form an agreement, *id.* (citing *Berman v. Freedom Fin. Network, LLC*, 30 F. 4th 849, 857 (9th Cir. 2022) ("A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement.")). It also asserts that there is no proof that Evoke "did in fact 'install, activate, copy, or use' [ImageKeeper's] software." ECF No. 316 at 20.

In response, ImageKeeper notes that Evoke already attempted to utilize the EULA's arbitration clause, and it should not be allowed to "cherry-pick the circumstances for when the EULA is valid." ECF No. 325 at 36. Additionally, it points to the early-litigation declaration of Tim Love, in which he stated that "[t]he Evoke team would have had to accept the End-User License Agreement presented on the FEMA SC App landing screen via a click-through agreement in order to access the application even is test mode." *Id.* (quoting ECF No. 30 at 6). It cites two cases—*MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 935, 955 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, 2011 WL 538748 (9th Cir. Feb. 17, 2011) and *Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024)—for the proposition that "[c]lick-through EULAs on all general users of a company's website or software are generally enforceable." *Id.* It argues that the EULA explicitly

43

states it is a binding contract, and that even without evidence that Evoke installed, activated, or copied the program, it is sufficient that Evoke "used" it. *Id.* at 36–37.

In its reply, Evoke insists that because ImageKeeper produced "no evidence of a screenshot of or a digital time-stamped report showing [Evoke] 'accepted' its terms," there is no proof that Evoke accepted this contract. ECF No. 337 at 19 (quoting *Perficient, Inc. v. Palfery*, 2022 WL 1102117, at *5 (E.D. Mo. Apr. 13, 2022). It also notes that in the *MDY Industries* case cited by ImageKeeper, acceptance of the EULA was not addressed, and in *Keebaugh* the court discussed a "clickwrap agreement" in which users are required to "click on an 'I agree' box . . . ." *Id.* (citing 629 F.3d at 955 and 100 F.4th 1005 at 1014).

First, I note that Evoke is incorrect that no evidence has been produced. The Love declaration, which is not self-serving seeing as Love is an officer at Wright, provides evidence from which, in the light most favorable to ImageKeeper, an agreement can be ascertained.

However, this evidence is slim, and I find it odd that despite years of litigation, ImageKeeper has yet to produce any digital documentation either (1) showing manifest assent from Evoke or (2) walking clearly through the login mechanics of its app to show where a party logging in would agree to the terms. The fact that it continues to rely on the declaration of Love is confounding and nearly fatal to its claim. ImageKeeper has produced virtually no evidence to show to what extent Evoke actually manifested assent. As is explained in *Berman*, the user must be "explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." 30 F. 4th at 857. ImageKeeper points to the EULA stating that it is a legal contract to which a user is bound, but it has not explained anywhere how the EULA is presented to users of the ImageKeeper app. Love states that the EULA is "presented on the FEMA SC App landing screen via a click-through agreement" but does not articulate whether, and to what extent, the click-through screen explicitly presents the terms and conditions of the agreement. However, in making all inferences in favor of ImageKeeper, there remains a dispute of material fact, because it remains possible—from the evidence presented—that the screen to

1  which Evoke logged in each time did, in fact, present the entirety of the EULA. If so, it was given

2  notice, to which it allegedly assented, that the EULA was legally binding. Therefore, I deny

3  Evoke's summary judgment motion as to Count 12.[22]

4      **D. Parties' motions to seal (ECF Nos. 341, 342, and 343)**

5      The parties have filed three motions to seal. In its motion, Wright seeks leave to file

6  redacted versions of its motion for summary judgment (ECF No. 319) and Exhibit C (ECF No.

7  319-5), and its reply in support of its motion (ECF No. 332), along with Exhibit 1 to the D. Stuart

8  Bartow declaration attached to the reply (ECF No. 332-2). Mot., ECF No. 341. Wright

9  previously sought to redact and strike certain documents (ECF Nos. 318 and 331)—including the

10  motion and reply—which I denied without prejudice, finding that Wright had not provided

11  sufficient explanation for why the documents should be redacted. ECF No. 340 at 4. I explained

12  that it was not enough to state that "[t]he fact that the parties have agreed to keep information

13  confidential in a protective order without more does not provide a compelling reason to seal a

14  court record." *Id.* (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1138 (9th Cir. 2003)).

15      Although there is a "strong presumption" in favor of access, there may be compelling

16  reasons to seal "business information that might harm a litigant's competitive standing." *Nixon v.*

17  *Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). Here, Wright has articulated that portions of its

18  summary judgment motion, reply, and related documents contain trade secrets and/or sensitive

19  and confidential business information relating to its business, ImageKeeper's business, and

20  agreements between the two. Wright has further narrowly tailored its request to only the

21  material which warrants secrecy by selectively requesting to redact only the portions of the

22  documents which reference this confidential business information, even providing helpful charts

23  to explain each of its proposed redactions. ECF No. 341 at 3. For that reason, the court grants

24  Wright's motion to seal. *See Bullion Monarch Mining, Inc. v. Barrick Goldstrike Mines, Inc.*, 2018 U.S.

25

26  [22] ImageKeeper, in a separate portion of its response to Evoke's motion, also argues that Hari Alla's October 2, 2024 declaration is inadmissible. ECF No. 325 at 37–38. Because I did not base any of my findings on this declaration, I do not make a ruling either way on its admissibility.

Dist. LEXIS 187819, at *2, *13 n.2 (D. Nev. Nov. 1, 2018) (finding compelling reasons to seal selective references to and exhibits describing defendant's confidential business information because it may harm defendant's competitive standing if revealed).

ImageKeeper moves to file redacted versions of its opposition to Wright's motion for summary judgment (ECF No. 321), as well as redacted or sealed Exhibits A-G (ECF Nos. 321-1 to 321-7) and Exhibits K-M (ECF Nos. 321-11 to 321-13). Mot., ECF No. 342 at 2. ImageKeeper previously sought to have its opposition and exhibits A through M sealed (ECF No. 322), which I denied without prejudice. ECF No. 340 at 5. Like Wright, in its previous motion ImageKeeper also leaned on the fact that the parties had designated the documents as confidential, which I found did not constitute a compelling reason to seal its opposition and exhibits. *Id.* Now, ImageKeeper provides a table explaining the extent to which each of its documents is secret, stating "The highlighted portion contains confidential business information of ImageKeeper" and variations thereupon. ECF No. 342 at 3–5. Although for its opposition and for some of its exhibits, this explanation is sufficient to warrant redactions, ImageKeeper's cookie-cutter response is insufficient to explain why it seeks to seal entire portions of the deposition transcript of Rule 30(b0(6) witness Michael Patterson in Exhibit A. For Exhibit A (ECF No. 321-1), ImageKeeper seeks to have the transcript portions sealed entirely, explaining that "[t]he exhibit contains confidential business information of ImageKeeper, confidential and proprietary information relating to the Trade Secrets, and business information relating to ImageKeeper and Wright Flood's confidential agreements." *Id.* at 3–4. However, having reviewed the excerpted deposition transcript in the exhibit, certain questions and responses do not fall under this explanation. For example, Patterson gives a long answer about contacting and meeting with insurance companies in 2013. *See* ECF No. 321-1 at 7–8. Nothing about this statement seems to fall under "confidential business information" and ImageKeeper has not explained why it would. Because there is a "strong presumption" in favor of access, I find that ImageKeeper has not provided compelling reasons for why Exhibit A (ECF No. 321-1) should be sealed in its entirety.

I find that ImageKeeper has provided compelling reasons to overcome the strong presumption of public access as to its opposition and remaining exhibits. Therefore, this motion is granted in part and denied in part. To the extent that it is denied, it is denied without prejudice. ImageKeeper is provided one more opportunity to submit a redacted version of Exhibit A along with a renewed motion to seal within ten days of this order.

ImageKeeper also moves to file redacted versions of its opposition to Evoke's motion for summary judgment (ECF No. 325), as well as redacted or sealed Exhibits N-P (ECF Nos. 325-1 to 325-3), Exhibits U-Z (ECF Nos. 326-2 to 326-7), Exhibit BB (ECF No. 327-2), and Exhibits DD-EE (ECF Nos. 372-3 to 327-5). Mot., ECF No. 343. ImageKeeper previously sought to have its opposition and over a dozen exhibits sealed, which I denied without prejudice. ECF No. 340 at 5. Here, however, it provides a chart and offers some—albeit limited and cookie-cutter—reasoning for its redactions. Nonetheless, having reviewed the exhibits, I find that there are compelling reasons to allow for these redactions and the sealing in entirety of Exhibits V, X, Y, Z, and BB. Therefore, ImageKeeper's motion to seal is granted.

## IV.  Conclusion

IT IS THEREFORE ORDERED that Wright and Evoke's motion for summary judgment **[ECF No. 318-1 (sealed), ECF No. 319] is GRANTED in part and DENIED in part.** Further, Evoke's motion for summary judgment **[ECF No. 314, ECF No. 316 (sealed)] is GRANTED in part and DENIED in part**, and its joinder **[ECF No. 320] is GRANTED.** Thus:

- I deny summary judgment as to the Count 1 (DTSA) and Count 2 (NUTSA) claims against both defendants to the extent they are based on alleged Trade Secret 6.
- Summary judgment is granted as to the Count 1 (DTSA) and Count 2 (NUTSA) claims against both defendants to the extent they are based on alleged Trade Secret 3.
- Summary judgment is granted as to the Count 3 (Nevada Infringement of Trade Secrets) claim.
- Summary judgment is granted as to the Count 7 (NCCL) claim.

- Summary judgment is granted as to the Count 9 (Nevada Unfair Trade Practices) claim.
- Summary judgment is granted as to the Count 11 (Nevada Unfair Competition/Breach of the Duty of Loyalty) claim.
- I deny summary judgment as to the Count 8 (NDTPA) claim against both defendants.
- Summary judgment is granted as to the Count 10 (breach of the covenant of good faith and fair dealing) claim against defendant Wright, whether grounded in tort or contract.
- I deny summary judgment as to the Count 5 (SCA) claim against both defendants.
- Summary judgment is granted as to the Count 6 (CFAA) claim against both defendants.
- I deny summary judgment as to the Count 4 (breach of contract) claim against defendant Wright.
- I deny summary judgment as to the Count 12 (breach of contract) claim against defendant Evoke.

IT IS FURTHER ORDERED that Wright's motion to seal **[ECF No. 341] is GRANTED.** The Clerk of Court is directed to seal ECF No. 318-1 and ECF No. 318-2.

IT IS FURTHER ORDERED that ImageKeeper's first renewed motion to seal **[ECF No. 342] is GRANTED in part and DENIED in part** as set forth in this order. To the extent that it is denied, it is denied without prejudice. The Clerk of Court is directed to maintain the seal on ECF No. 321; ECF Nos. 321-1 through 321-7; and ECF Nos. 321-11 through ECF No. 321-13. ImageKeeper is provided one more opportunity to submit a redacted version of Exhibit A along with a renewed motion to seal by July 7, 2025.

IT IS FURTHER ORDERED that ImageKeeper's second renewed motion to seal **[ECF No. 343] is GRANTED**. The Clerk of Court is directed to maintain the seal on ECF Nos. 325, 325-1 through 325-3; ECF Nos. 326-2 through 326-7; and ECF Nos. 327-2 through 327-5.

Dated: June 24, 2025

_____
Cristina D. Silva
United States District Judge